**INDUSTRIAL QUIMICA DEL NALON, S.A., as successor to Asturquimica, S.A., Plaintiff,**

v.

**UNITED STATES, C. William Verity, Secretary of Commerce, Jan Mares, Deputy Assistant Secretary for Import Administration, and William Von Raab, Commissioner of Customs, Defendant.**

**Court No. 88–07–00492.**

United States Court of International Trade.

Dec. 21, 1989.

As Amended March 13, 1990.

Kaplan, Russin and Vecchi, Dennis James, Jr. and Kathleen F. Patterson, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ.Div., U.S. Dept. of Justice, Washington, D.C., Jane E. Meehan, for defendant.

MUSGRAVE, Judge.

## OPINION

Plaintiff claimed adjustments during the review of an outstanding antidumping order covering potassium permanganate from Spain. The claimed adjustments, relating to technical services and invoice processing costs, currency appreciation, and tax rebates, were rejected by the International Trade Administration of the Department of Commerce. Plaintiff challenges those denials by motion for judgment on the agency record.

*Held:* Plaintiff's motion granted in part; remanded in part.

## BACKGROUND

Plaintiff contests the denial by the International Trade Administration of the Department of Commerce ("ITA") of certain adjustments claimed during a review of an outstanding antidumping order. In 1984, ITA published an affirmative finding that potassium permanganate was being dumped into the U.S. in part by Asturquimica,[1] the sole Spanish exporter of the same. 49 Fed.Reg. 2277 (January 19, 1984). However, no dumping margins were assessed in the original investigation. 49 Fed.Reg. 18341 (April 30, 1984). ITA did not undertake subsequent reviews until the petitioner Carus, a domestic competitor, requested a review of the third round. Public Record Document ("PR Doc.") 2 at 21.

During the review proceedings, plaintiff requested that a fair comparison of U.S. and Spanish market prices called for adjustments to account for: (1) technical services and invoice processing costs borne in Spain but not in the United States, (2) the significant appreciation of the Spanish peseta vis-a-vis the U.S. dollar during the review period, and (3) taxes rebated on the potassium permanganate exported to the United States. The adjustments were denied, and the final review results showed dumping margins of 16.16 percent. This action ensued under 28 U.S.C. § 1581(c). Plaintiff has moved for judgment based on the agency record; defendant opposes the motion and seeks affirmance of the agency determinations.

## DISCUSSION

The high degree of deference that this Court must grant to the government's discretion in the administration of the antidumping law must, by now, be legendary. See, e.g., Smith–Corona Group v. United States, 713 F.2d 1568, 1571 (Fed.Cir.1983). In order to obtain the relief requested, plaintiff must show that ITA's determination was "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B) (1988). This Court will sustain the agency's interpretation of a statute if it is "sufficiently reasonable to be accepted by a reviewing court," Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978), its application of a valid regulation if it "was reasonable and neither arbitrary nor in violation of the law," Melamine Chemicals, Inc. v. United States, 732 F.2d 924, 933–34 (Fed.Cir.1984), and the methodology it employs in fulfilling its statutory mandate. Ceramica Regiomontana, S.A. et al. v. United States, et. al, 10 CIT 399, 404, 636 F.Supp. 961, 965–966 (1986), aff'd, 810 F.2d 1137 (Fed.Cir.1987); see also Consumer Prod. Div., SCM Corp. v. Silver Reed America, 753 F.2d 1033, 1039 (Fed.Cir.1985).

With these principles in mind, the Court turns to plaintiff's three contentions.

### A. Technical Services and Invoice Processing Costs

On February 23, 1987, ITA initiated an administrative review for the third round (covering the period January 1, 1986 to December 31, 1986) and sent a questionnaire to Asturquimica. PR Doc. 9 at 8. Asturquimica responded on May 8 and claimed an adjustment for the salaries of two chemical engineers devoted solely to helping Spanish customers with traditional and new applications, handling complaints and technical enquiries, and writing relevant technical literature directed to customers. Confidential Record Document ("CR Doc.") 1 at 21.

Asturquimica also claimed an adjustment to account for significant cost differences between Spanish and American sales derived from invoice processing. Id. Apparently, the processing of invoices in Spain was handled by an outside firm unrelated to Asturquimica, which then charged Asturquimica based on the number of invoices processed. The processing expense for each invoice was identical, regardless of

---

**1.** To clarify matters, plaintiff will hereinafter be referred to by their previous name, Asturquimica, the name used in all prior proceedings.

the quantity of potassium permanganate involved or the location of the customer. Asturquimica argues that orders from the U.S. distributor were significantly fewer than the number of orders from customers in Spain, and since the U.S. orders involved vastly greater quantities than the orders in Spain, the invoice processing on a cost-per-ton basis was significantly different in the two markets.

On November 5, 1987, ITA sent a supplemental questionnaire requesting further explanation of the outside firm's total charge to Asturquimica. CR Doc. 4 at 196–97. Specifically, officials inquired whether the amount included charges other than invoice processing, and whether a set charge per invoice existed. *Id.* at 196. Asturquimica responded with information claimed to be of the type "normally" supplied in response to ITA questionnaires; that "[t]heir invoices do not show a set charge per invoice but their total charge is tied to the number of invoices processed in a given period." CR Doc. 5 at 204–206. Plaintiff provided a breakdown of the specific services provided by the outside firm alleged to be "directly related" to invoice processing. *Id.* ITA requested no further information of plaintiff. Subsequently, the petitioner Carus requested that ITA verify Asturquimica's responses, CR Doc. 2 at 144–149, which the agency declined to do.

The preliminary determination denied the first adjustment on the grounds that the salaries of the two engineers were "general promotional services" and not "directly related to the sales under consideration as required in section 353.15(a) of the Commerce regulations." 53 Fed.Reg. 1051, 1052 (January 15, 1988). The second adjustment was denied because the costs "were not directly related to the sales under consideration...." [2] *Id.*

On February 9, 1988, ten days before the hearing on the final determination, plaintiff submitted a pre-hearing brief and appended 215 pages of documents purporting to support the claimed adjustments that were denied in the preliminary determination. ITA refused to consider the additional information because it was untimely submitted. 53 Fed.Reg. 21504, 21505 (June 8, 1988).

In the final determination, ITA denied the second adjustment because "Asturquimica did not actually pay a charge for each invoice for the sales under consideration. Therefore, as no expense could be considered ... directly related to any particular sale, no adjustment was allowed." *Id.*

The government insists that verification of Asturquimica's claims was discretionary in this instance, that it lawfully determined that verification was unnecessary, and that the denial of the adjustments was proper, based upon evaluation of the timely-submitted information.

■ Thus, the Court must determine whether ITA was *required* to verify the information submitted by plaintiff during the preliminary review, after a request to do so was made by an interested party, or whether verification was within the discretion of ITA under 19 U.S.C. § 1677e(b). After reviewing the statute itself, the legislative history of that law (and its revisions), and considering the effect of a decision by our appellate court on those revisions, this Court concludes that verification, in this instance, was mandatory.

Under the Trade Agreements Act of 1979, Congress was required to conduct annual reviews under the strict timetable of 19 U.S.C. § 1675 (1982). As enacted, § 1677e(a) required that ITA verify information relied upon in making a "final determination in an investigation," [3] and allowed the administering authority to penalize a recalcitrant respondent by making use of the "best information available" as the

---

**2.** In another memorandum, ITA further explained that it "denied Asturquimica's claim for this adjustment because while Asturquimica provided the total amount billed for this service, they did not provide a specific amount for each invoice for the sales under consideration." PR Doc. 37 at 438.

**3.** This provision was added in part because of Congress' dissatisfaction with the Treasury Department's practices on verification, or lack thereof, under prior law. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 98 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 484.

basis for a determination.[4] The Act was unclear as to whether administrative reviews were an "investigation," thus requiring verification of information relied upon in such proceedings.

However, when Congress amended these provisions under the Trade and Tariff Act of 1984, it took note of the fact that ITA normally verified information used in administrative reviews when presented with "a significant question of law or fact."[5] H.R.Rep. No. 725, 98th Cong., 2d Sess. 42 (1984). The 1984 Act amended 19 U.S.C. § 1675 to require administrative reviews when requested, or upon Commerce's initiative, in response to the perceived administrative burden previously imposed by the requirement of automatic annual reviews which often proved unnecessary. The new provision read:

(a) General Rule

The administering authority shall verify all information relied upon in making—

\* \* \* \* \* \*

(3) a review and determination under section 1675(a) of this title, if—

(A) verification is timely requested by an interested party ..., and

(B) no verification was made under this paragraph during the 2 immediately preceding reviews and determinations under that section of the same order, finding, or notice, except that

this clause shall not apply if good cause for verification is shown.

19 U.S.C. § 1677e (Supp. III 1985).[6]

Twenty-seven days before the effective date of the 1984 amendments (October 30, 1984), the Court of Appeals for the Federal Circuit issued its own pronouncement on the issue of whether verification was discretionary or required in administrative reviews under the Trade Agreements Act. In *Al–Tech Specialty Steel Corp., et al. v. United States,* 745 F.2d 632 (Fed.Cir.1984), the government argued that "no verification is required for information relied upon in making a determination of antidumping (or countervailing) duty in the assessment phase, or in a periodic review, because ... such a determination is not 'a final determination in an investigation' under § 1677e(a)." In rejecting this contention, the Court of Appeals for the Federal Circuit examined the legislative history to the 1979 Act and concluded that Congress could not have intended that the term "investigation" be limited only to original antidumping investigations under that section, and that therefore Commerce is required to conduct verification in administrative review proceedings as well. 745 F.2d at 636–640.

Because of these concurrent judicial and legislative pronouncements on verification, this Court requested briefs from the parties as to the status of *Al–Tech* in light of the 1984 Amendments. The government

---

**4.** As enacted, § 1677e read in pertinent part as follows:

(a) General Rule

Except with respect to information of which is waived under section 1673b(b)(2) of this title, the administering authority shall verify all information relied upon in making a final determination in an investigation. In publishing such a determination, the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its determination, which may include the information submitted in support of the petition.

(b) Determinations to be made on best information available

In making their determinations under this subtitle, the administering authority ... shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e (1982).

**5.** Plaintiff claims this was the first time it pressed for the adjustments that were denied. If such was the case, then based upon the information that was *timely* submitted, ITA had before it new, significant issues of law or fact that should have been verified rather than summarily dismissed.

**6.** This section has since been recodified as 19 U.S.C. § 1677e(b) (1988).

submits that the amended section 1677e "flatly overturned" *Al–Tech.*

However, the Court doubts whether Congress could have considered that case when deliberating on the revisions to the antidumping laws.[7] The Committee Report to H.R. 4784 stated the following as among its reasons for the amendment:

> The Committee ... believes it *essential* for the proper enforcement of the laws that information used *in determining annually* the actual amount of any ... antidumping duty to be assessed under outstanding orders is *accurate to the extent possible.* At the same time, the Committee is concerned that requiring verification in every review would result in an additional administrative burden on the Department of Commerce or perfunctory verifications. Therefore, *verification would not be required if* an interested party does not request it in a timely manner, or after *recent verifications have taken place* unless shown to be warranted.

H.R.Rep. No. 725 at 43 (May 1, 1984—more than *five months* before *Al Tech* ). (Emphasis supplied.) Nowhere in the legislative history to the 1984 amendments is *Al Tech* mentioned. Thus, the amendments could hardly have overturned a decision that was not yet issued, and thus never considered, during the drafting of the legislation.

Furthermore, contrary to the government's position, the 1984 amendments resulted in less discretion as to verifying, not more. Those legislative revisions are therefore in agreement with and support the rationale, if not the conclusions, of the Court of Appeals for the Federal Circuit in *Al–Tech.* Although § 1677e may have inadvertently overturned the specific holding of *Al–Tech,* the analysis, rationale and logic of our appeals court's analysis remain intact, limiting ITA's discretion to verify.

Lastly, the goal of the Trade and Tariff Act of 1984 was to promote the interest of administrative economy during reviews of antidumping orders. H.R.Rep. No. 725 at 22–23. Those interests are not served by concealed decisions on verification during the review process. In ITA's view, without knowing in advance whether ITA will verify, respondents are encouraged to swamp the agency with documentation in support of respondents' claims. Such an outcome adds to, not lessens, ITA's administrative burden, where the submission of such documentation may not be necessary. These occasions might occur where dumping margins would not be assessed regardless of the respondent's claims, or where ITA would have allowed the requested adjustments even without verification, or where the documents are frivolous and do not further the claims of respondent.

In light of the 1984 amendments, the more reasonable approach is to require that ITA determine upon receipt of a respondent's responses to the questionnaire whether or not it will verify and announce its reasons for such. If it does not intend to verify, then ITA (at its discretion), could allow respondents a reasonable time to submit the type of documentation normally considered at verification in support of their claims. Such an approach seems fair, and would not significantly add to ITA's administrative burden.

■ The Court thus concludes that it is not unduly onerous to require the ITA to verify information used in review determinations if (1) requested to do so by an interested party, (2) no verification has taken place during the two prior years, and (3) there is a minimal indication of changed circumstances justifying verification. In the instant case, the review requested by the domestic industry petitioner Carus satisfied the first condition of the statute, and the second condition was met as well, inasmuch as the ITA undertook no reviews and thus made no verifications during the two preceding review periods. Evidence in the record indicates, at a minimum, changed circumstances, satisfying the third condition. Therefore, verification was not discretionary, but mandatory, in this instance.

---

7. The Court of Appeals for the Federal Circuit issued *Al Tech* on October 3, 1984; the enactment of the amendment (§ 618) took effect on October 30, 1984, a mere 27 days later.

In fact, the Court can find no alternatives to requiring ITA to comply with the clear language of the statute. The government's action in failing to verify was not in accordance with the law. Consequently, the government erred in not conducting verification as required by 19 U.S.C. § 1677e. In this instance, ITA should verify Asturquimica's responses on remand and should consider the information submitted by Asturquimica in its pre-hearing brief, if such is the type of information normally relied upon or received by ITA when conducting verification.

### B. *Exchange Rate Adjustment*

Plaintiff also contests ITA's refusal to apply some form of adjustment to account for the appreciation of the Spanish peseta during the review period. At the end of 1985, the U.S. dollar was worth about 180 pesetas. At the beginning of the 1986 review period, the dollar dropped to 153 pesetas, and then to 133 pesetas by the end of December. The peseta thus appreciated 13 percent over the review period, or 26 percent overall.

To avoid the assessment of dumping margins while trying to remain competitive in the U.S. market, Asturquimica made two upward adjustments to its export prices, denominated in dollars, totalling 6 percent during the review period. Even after raising its prices, Asturquimica made a number of sales to its U.S. distributor at pre-adjustment prices so that the latter could meet prior contractual obligations.

Plaintiff requested that ITA apply the "special rule" for currency conversion of 19 C.F.R. § 353.56(b) (1988),[8] a rule that allowed the calculation of exchange rates for specific purchases 90 days after the date of sale in "fair value investigations" to avoid being penalized "for circumstances beyond its control." *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 933 (Fed.Cir.1984). In the alternative, the plaintiff requested that ITA use a circumstance of sale adjustment to achieve the same result, or calculate foreign market value using a one-year or six-month average home market price.

ITA refused these requests and calculated a monthly weighted-average home market price using currency rates certified by the Federal Reserve Bank and date-of-purchase sales prices. The final weighted-average dumping margin was 16.16 percent. 53 Fed.Reg. at 21506.

Plaintiff argues that ITA was unreasonable not to consider the exchange rate changes because, in this instance, the changes themselves are the cause of the dumping margins. Plaintiff points out that it could not reasonably be expected to respond to the changes in the exchange rate in the manner compelled by ITA, since plaintiff sold through its U.S. distributor which, in turn, had binding contracts with local municipalities. These binding contracts were negotiated through competitive bidding on an annual basis. Plaintiff also points to its "good faith effort" to respond to the changes in the exchange rate through upward adjustments of its U.S. prices.

Thus, plaintiff frames the issue not around application of the "special rule" *per se*, but as whether the rapid appreciation of the Spanish peseta called for some form of adjustment to compensate for the otherwise strict rules of currency conversion, and whether it is therefore unfair not to have achieved the same result called for under 19 C.F.R. § 353.56(b) through a circumstance of sale adjustment under 19 U.S.C. § 1677b(a)(4)(B) (1988).

ITA contends at the outset that its application of § 353.56(b) was fully supported by law because that section is "authorized" only at the initial stages of antidumping

---

**8.** 19 C.F.R. § 353.56(b) (1988) reads as follows:

(b) *Special rules for fair value investigations.* For purposes of fair value investigations, manufacturers, exporters, and importers concerned will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. Where prices under consideration are affected by temporary exchange rate fluctuations, no differences between the prices being compared resulting solely from such exchange rate fluctuations will be taken into account in fair value investigations.

proceedings to determine whether sales are occurring at less than fair value ("LTFV"), and not during review proceedings. The cause of the exchange rate decline is irrelevant, they maintain, because no statute or regulation authorizes the consideration of such a factor in administrative reviews. The rationale for denying application of the special rule to administrative reviews, ITA argues, is that under a fair value investigation, interested parties are "on notice" that prices will be monitored for purposes of those reviews. A respondent possesses the means to regulate its prices and must bear the risk of avoiding dumping margins due to currency changes.

■ Since the institution of these proceedings, the governing regulatory provisions have been altered, with 19 C.F.R. § 353.56(b) having been superceded by 19 C.F.R. § 353.60(b) (1989), which now reads:

(b) *Special rules for investigations.* For purposes of investigations, producers, resellers, and importers will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. When the price of the merchandise is affected by temporary exchange rate fluctuations, the Secretary will not take into account in fair value comparisons any difference between United States price and foreign market value resulting solely from such exchange rate fluctuation.

Several notable changes from the previous provision are immediately apparent. First, "manufacturers" and "exporters" have been replaced by "producers" and "resellers." Because "producer," as defined in 19 C.F.R. § 353.2(r) (1989), means "a manufacturer," plaintiff (a manufacturer) is not precluded from invoking this regulation to support their claim for an adjustment.

Also, the phrase "fair value investigation" in § 353.56(b) has been replaced by the more generic "investigation." Not content to simplify matters, of course, the agency added a definition of "investigation" [9] not found in the previous provision:

(1) *Investigation.* An "investigation" begins on the date of publication of notice of initiation of investigation and ends on the date of publication of the earliest of (1) notice of termination of investigation, (2) notice of rescission of investigation, (3) notice of a negative determination that has the effect of terminating the proceeding, or (4) an order.

19 C.F.R. 353.2(1) (1989).

When read in conjunction with the above definition, 19 C.F.R. § 353.60(b) would ostensibly limit the application of the currency conversion rule to any period of time encompassing the fair value phase of the investigation, but in any event, no later than after the antidumping order has been issued. Such a reading of the new regulation would seem to preclude use of the currency conversion rule during a review period, thus rendering the submission of any data relating to currency fluctuation during the administrative review period irrelevant.

However, after examining the history of this regulation, prior practice by the ITA, and the language of the regulation itself, this Court finds that a narrow interpretation of the new § 353.60(b) is not warranted. The regulation applies with equal force to review determinations, as well as fair value investigations.

In 1976, the Department of the Treasury ("Treasury") promulgated the precursor to § 353.56(b) [10] in order to address the problems associated with allowing the dollar to float on international currency markets. ITA justified the rationale for the special rule as follows:

The purpose of [§ 353.56] is clear. Antidumping investigations are meant to determine whether prices of merchandise sold in the United States are at less than

---

**9.** This addition may have been in response to the confusion surrounding the meaning of "investigation," as noted earlier.

**10.** The language of 19 C.F.R. § 353.56(b) (1988) remained the same under ITA's jurisdiction as it did when first issued by Treasury in 1976. *Cf.* 19 C.F.R. § 153.52(b) (1976), *reprinted in* 41 Fed.Reg. 26203, 26214 (June 25, 1976).

"fair value." When exchange rates are fluctuating substantially, a given dollar price of a product in the United States could change technically from fair to "unfair" literally from day to day, even if the foreign price of the product denominated in the foreign currency also remained constant. This result is not called for by the language or purpose of the Act. It would be unrealistic to expect business to change prices instantaneously to take account of fluctuating exchange rates. So too, weekly price changes could create substantial confusion and inconvenience for the customers of that business.

The regulation, then, allows a reasonable period in which business may take sustained exchange rate fluctuations into account. The regulation further instructs that temporary fluctuations should not be the sole basis for determinations of less than fair value sales. Businesses are to be given time to assess whether one currency has truly appreciated against another before changing their pricing practices.

45 Fed.Reg. 29619, 29620 (May 5, 1980). Thus, the purported purpose behind the special rule is to avoid finding artificial margins of dumping where none, in fact, exist.

The special rule of the old § 353.56(b), as written, applied to fair value investigations. "Fair value" is used as an estimate of foreign market value during an original dumping investigation and provides ITA with greater flexibility in administering the antidumping law. *See* H.R. Rep. No. 317, 96th Cong., 1st Sess. 59 (1979). The term "fair value" is not defined by statute, H.R.Rep. No. 317 at 59, but refers to the value of the goods in the country in which they are produced. *Kleberg & Co. (Inc.) v. United States*, 21 CCPA 110, 115 T.D. 46446, 71 F.2d 332 (1933). Merchandise is sold at LTFV if the purchase price or the exporter's sales price is less than the foreign market value or the cost of production thereof. *Id.*

On the other hand, "foreign market value" is defined as the price at the time of exportation to the U.S. at which such or similar merchandise is sold or offered for sale in the usual wholesale quantities and in the usual course of trade. 19 U.S.C. § 1677b(a)(1) (1988). 19 C.F.R. § 353.2 (1988) also provided a scheme for determining foreign market value, as does 19 C.F.R. §§ 353.46 *et seq.* (1989).

In discussing the administration of the antidumping law by Treasury, Congress noted the interplay between the terms "fair value" and "foreign market value:" "[a]ppropriate adjustments to foreign market value for differences in circumstances of sale and adjustments to other price calculations are made in calculating foreign market value, as they are made in calculating fair value during the original investigation." S.Rep. No. 249 at 79. Treasury thus applied the same standards during the determination phase as in the assessment phase, and Congress intended that ITA continue to do the same. Consequently, it makes little sense to apply a regulation only during the determination phase (when only an estimate is necessary), and not during the assessment phase (which calls for a similar but more accurate calculation).

In addition, the Court of Appeals for the Federal Circuit has stated that ITA, in inheriting the administration of the antidumping law, has

a duty to enforce *fairly* the antidumping laws by determining whether LTFV sales are or are *not* occurring. The purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at less than fair value by the imposition of appropriately increased duties. That purpose would be illserved by a mechanical application of a mechanical formula to find less than fair value sales, and thus a violation of the U.S. antidumping laws, where none existed. A finding of less than fair value sales based upon a margin resulting solely from a factor *beyond the control* of the exporter would be unreal, unreasonable, and unfair.

*Melamine Chemicals v. United States*, 732 F.2d at 934 (emphasis added in part). If

currency fluctuations are beyond the exporter's control in fair value investigations, it is difficult to understand why ITA will apply the rule to eliminate a factor beyond the exporter's control in the initial dumping investigation (a determination using a mere *estimate* of foreign market value), but not in an administrative review (when *actual* foreign market value must be used). If a factor is truly beyond the control of the exporter, the exporter cannot, by definition, make adjustments to compensate. The rationale of the special rule, then, should apply whether the proceeding is a dumping determination or a subsequent review.

When reduced to their essence, then, the terms "fair value" and "foreign market value" are almost interchangeable. Whether a proceeding is an original determination or a subsequent review, the issue is a comparison of U.S. price and the value of the goods in the foreign market. ITA will therefore make appropriate adjustments in order to make a fair and just comparison that reflects economic reality between the two prices.

Recognizing this, the new 19 C.F.R. § 353.42 turgidly references the interrelationship between the two terms:

§ 353.42  Fair Value

(a) *Relationship to foreign market value.* Fair value, used during the investigation, is an estimate of foreign market value. Except as otherwise specifically noted, a reference in this subpart to "foreign market value" applies to "fair value," but a reference to "fair value" in this subpart does not necessarily apply to "foreign market value."

Allowing "foreign market value" to encompass all references to "fair value" (but not the converse) indicates that the former term, being the more accurate of the two, must necessarily include all fair value references, since fair value is only an approximate calculation of foreign market value. Logically, then, it would make little sense to apply the currency conversion rule only during the initial investigation, yet prevent its utilization during the later administrtive

reviews, which seek to obtain the most accurate data possible.

The Court also notes that the logic of ITA's position—allowing the use of § 353.60(b) only during the investigation phase—is undercut by their own argument regarding the circumstance of sale adjustment in this case. In *Tubeless Steel Disc Wheels from Brazil, Amended Final Determination of Sales at Less Than Fair Value and Amended Antidumping Order,* 53 Fed.Reg. 34566 (Sept. 7, 1988), ITA declined to use the "90 day lag rule" to Brazil's hyperinflationary economy, which generally had been the only method for dealing with currency fluctuations. Instead, a circumstance of sale adjustment was allowed because currency fluctuations were beyond the control of Brazilian exporters, despite the fact that that regulation applies by its terms to adjustments "directly related" to sales of merchandise. In the ITA's view:

"As demonstrated by the special rules under § 353.56(b) of our regulations, the Department has long recognized that the special circumstances of a particular case may require us to compensate for the otherwise strict rules for currency conversion found under § 353.56(a) to arrive at a fair comparison ... *Although § 353.56(b) addresses situations other than the one present here, the same concern to achieve a fair comparison which cause [sic] § 353.56(b) to be promulgated, compels us to make a circumstance of sale adjustment pursuant to § 773(a)(4)(B) of the Act in order to arrive at a fair comparison.*

\*     \*     \*     \*     \*     \*

While petitioner is correct that the Department typically uses circumstances of sale adjustments to adjust for different selling expenses incurred in the two markets, *we are not precluded from using this provision to achieve a result that reflects economic reality and is consistent with the basic purpose of the Act ...*"

*Id.* at 34567 (emphasis added).

The government thus deviated from its "usual methodology" to apply a circum-

stance of sale adjustment outside the regulation's stated applicability to achieve a rational and economically correct result; a result, the Court notes, that serves the purpose to which § 353.56(b) was addressed. Since ITA has already strayed from a rigid application of the old regulation, in spirit if not in fact, the agency is not, therefore, precluded from utilizing the new regulation in that same manner. The Court encourages such treatment to serve a rational purpose.

In addition, while deviation from a regulation may further the underlying rationale or purpose of the regulation, it also serves to highlight the fact that the regulation cannot encompass all circumstances at all times. ITA should therefore not be prevented from applying the special rule of § 353.60(b) to review proceedings as well as investigations, where the circumstances warrant. The Court therefore finds that ITA may apply the special rule of 19 C.F.R. § 353.60(b) to administrative reviews.

The government advocates that indiscriminate application of the special rule would eradicate the general requirement that exporters subject to an affirmative finding of sales at LTFV must monitor and adjust their prices accordingly. The Court does not dispute this logic. However, this ruling is not meant to compel ITA to utilize the special rule in all cases of currency shifts. The Court merely wishes to stress that the agency is not precluded from applying the special rule when circumstances warrant, as may be the case here.

The Court is aware, though, that confusion concerning a proper interpretation of the "circumstances" contemplated by the special rule has engendered an inconsistent application of § 353.60(b). ITA contends that only rapidly fluctuating and volatile exchange rates can trigger the invocation of the special rule.[11] For sustained changes in currency exchange rates, prudent business people will be expected to adjust their prices according, thus dispensing with any use of the special rule under those circumstances, claims ITA. Thus, only in cases of temporary currency fluctuations will ITA allow the application of § 353.60(b).

A plain reading of the statute would seem to compel an opposite conclusion. The Secretary is directed to discount "temporary exchange rate fluctuations" which create a difference between United States price and foreign market value, that difference resulting solely from such exchange rate fluctuation. Therefore, only during a period of "sustained changes" in currency rates would special treatment be warranted to allow producers a "reasonable" amount of time to account for the altered exchange rate in their pricing practices. *See* Rosenthal, *Current Issues in Antidumping Law,* 408 Practicing Law Inst.Comm. 9 (1987).

Unfortunately, either of these views is a reasonable interpretation of the regulation as presently drafted. Both also have their demerits. For instance, application of the rule to steady exchange rate changes may create the potential for abuse. An exporter could wait until the last day of the lag period before adjusting prices, and even then the exporter could also lag the adjustment by one quarter. How to impute to exporters a "proper" interpretation of changes in exchange rates as they occur

---

**11.** The application of the "special rule" only to situations of volatile fluctuations in exchange rates was explained in *Erasable Programmable Read Only Memories (EPROMs) from Japan: Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 39680 (October 30, 1986). Respondent Hitachi claimed that ITA should employ the previous quarter's exchange rate under the special rule in order to give the producer a reasonable time to adjust to sustained changes in exchange rates. In response, ITA stated:

We do not agree with Hitachi's interpretation of the special rule. Since the change in rela-

tive values of the currencies was moderate and progressive, it is reasonable to expect that Hitachi, in setting prices in the United States, would have taken into account then current exchange rates. To interpret the general statement in 19 C.F.R. 353.56(b) would render section (a) of this regulation meaningless, since no currency conversion would ever be made at the normal times called for in that section, unless there had been absolutely no change from quarter to quarter. This is not the intent of the regulation.
*Id.* at 39684–85.

114

for pricing decisions may also be problematic. Rates may fluctuate substantially day to day, and still be characterized with hindsight as "trending" upwards or downwards and characterized as part of a longer "steady" shift in exchange rates. Rates may also "steadily" move in one direction, only to reverse that trend by the end of the dumping investigation or review period.

At this stage, rather than opining on the matter, the Court will defer to ITA's expertise to develop more consistent modes of application of 19 C.F.R. § 353.60(b) in keeping with its duty to enforce the antidumping laws fairly. The Court trusts that upon remand, ITA will redetermine whether dumping margins in the instant case arose from a temporary or sustained shift in currency exchange rates, and whether application of the special rule or some other form of adjustment is called for under either circumstance.

## C. *Tax Rebate Adjustment*

Plaintiff lastly claims that ITA's denial of an adjustment for a tax rebate it received upon exportation to the U.S. of potassium permanganate was an abuse of discretion, unreasonable, unsupported by substantial evidence in the record and was not otherwise in accordance with the law. The relevant facts are as follows.

Prior to January 1, 1986, the raw materials used in the production of potassium permanganate were taxed under the "IGTE" and the Recargo Provincial ("Recargo") of the Spanish tax code. These taxes were rebated to the manufacturers of potassium permanganate under the provisions of the Desgravacion a la Fiscal Exportacion ("DFE"), upon exportation of the manufactured product. The DFE provided this refund for exporters only.

On January 1, 1986, Spain eliminated the DFE, and adopted a Value Added Tax ("VAT") system, which taxed all sales of potassium permanganate (both domestic and foreign) at 12 percent. Thus, all home market sales used in ITA's calculations were subject to the VAT.

In order to avoid double taxation, Spain adopted a transition scheme called the Regimen Transitorio del IVA ("Regimen") to rebate taxes paid on goods produced in 1985 (under the DFE system), but inventoried as of January 1, 1986 (the effective date of the VAT). According to ITA, the Regimen specifically provided a 6 percent general refund to any taxpayer, whether a domestic seller or an exporter, if that seller met the transition law's conditions. The Regimen also provided a supplementary deduction of 0.1 percent for export activities.

The potassium permanganate exported to the U.S. met the conditions under the Regimen and received VAT rebates. Plaintiff did not receive similar rebates for goods sold in Spain because those goods were produced in 1986, and thus were outside the scope of the Regimen (which applied only to taxes paid on goods *manufactured* in 1985, but *inventoried* in 1986). Thus, all of respondent's potassium permanganate bore the VAT, but the exported potassium permanganate received rebates of the VAT under the Regimen (6 percent) and the supplementary deduction for exporters (0.1 percent), an amount equal to what would have been received under the old DFE.

In the preliminary agency determination, ITA granted the adjustment for the VAT rebates. However, in the final determination ITA reversed itself, finding that Article 72.1(a) of the new Spanish VAT

> clearly states that the rebate was paid to Asturquimica because the goods were in inventory on January 1, 1986 and not because these goods were exported ... [I]f the potassium permanganate sold in Spain during the review period had been in inventory on January 1, 1986, Asturquimica would have received a rebate on those sales. For an adjustment to be made, the rebate must have been due to the export of the product.

53 Fed.Reg. at 21506.

This reversal occurred after the petitioner submitted to ITA the translation of a letter from Spanish counsel, postulating that the rebate received by plaintiff:

> ... was, pursuant to Spanish law, provided to *all* Spanish businesses meeting certain criteria. This deduction was not

merely a rebate for exporters. Article 72.6 of the Law provides for a *supplementary* deduction for export activities. Exporters of inventory held on January 1, 1986 would eventually have the right to a supplementary deduction from VAT liability equal to the result of applying the "DFE" (as explained in the above mentioned Annex 10 of Asturquimica, S.A. response) deduction rate in force at 31 Dec. 1985 less the 6 percent general deduction granted to all businesses.

PR Doc. 25 at 308–309 (emphasis in original).[12]

Asturquimica contends that the rebates in this case, being equal to the amount they would have received under the DFE (that is, 6.1 percent, rather than the 6 percent rebate available to all manufacturers) were in fact an extension of the DFE rebates, were for exporters only, and were thus received by reason of export. For support of this contention, it cites the translations of the Regimen,[13] PR Doc. 25 at 310, and a Royal Decree,[14] PR Doc. 25 at 311, provided by petitioner Carus. These establish, according to plaintiff, that the Regimen extended the DFE rebates. Therefore, ITA should have granted an adjustment to the U.S. purchase price and the exporter's sales price, in keeping with 19 U.S.C. § 1677a(d)(1)(C) (1988), which provides:

The purchase price and the exporter's sales price shall be adjusted by being—

(1) increased by—

   *     *     *     *     *     *

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation; ...

In the alternative, Asturquimica urges the government—consistent with its own policy on this matter [15]—to consider the tax rebate as a circumstance of sale adjustment to foreign market value, in accordance with 19 U.S.C. § 1677b(a)(4)(B). ITA's final determination did not address this alternative claim.

In opposition, ITA maintains they properly denied an adjustment to the United States price for tax rebates received because the rebates were not granted by "reason of exportation," as required by 19 U.S.C. § 1677a(d)(1)(C). The rebate was not conditioned upon, or directly linked to, exportation of the merchandise, argues ITA.

■ Thus, resolution of this issue depends on whether the tax rebates received by plaintiff under the Regimen were sufficiently connected to export of the potassium permanganate to fall within the parameters of 19 U.S.C. § 1677a(d)(1)(C), allowing an adjustment to U.S. purchase price and the exporter's sales price. Because plaintiff has presented a persuasive and reason-

---

**12.** Consideration of this letter by ITA seemingly contradicts their own stated policy: "It is the Department's position not to accept new data after publication of a preliminary determination." 53 Fed.Reg. at 21505.

**13.** Article 76.6 provides:
6. Nevertheless, in those cases provided for in Sec. 1a) ... of this paragraph, if the goods which are part of said inventory were ... exported abroad during the first year following the effective date of this Tax in the original state or after manipulation, the deduction percentage initially fixed will increase to the maximum rate in force at 31 Dec. 1985 *for the purposes of DFE.* (Emphasis added.)

**14.** Royal Decree 2028/1985 Oct. 30, Art. 189, "Export Deductions," reads:

1. Those taxpayers referred to in articles 185 ... of this Decree will be entitled to a supplementary deduction *equal to the result of applying the DFE taxation rate in force at 31 Dec. 1985, less 6 percentage points, over the total volume of exports,* ... of inventoried goods by-products thereof or any others of an analogous nature, during the year 1986. (Emphasis added.)

**15.** *See Final Determination of Sales at Less Than Fair Value; Certain Electrical Conductor Aluminum Redraw Rod from Venezuela,* 53 Fed. Reg. 24755, 24760 (June 30, 1988): "... it is our consistent practice to adjust foreign market value for export payments that are directly related to the production and/or sale of the products under investigation ..." (citations omitted).

able position to support its claim, and ITA initially granted the adjustment, and later reneged on its finding, this Court finds that ITA should have granted the adjustment for tax rebates under the Spanish tax code.

ITA in the instant case supports its position by analogy to *Roquette Freres v. United States*, 7 CIT 88, 583 F.Supp. 599 (1984), in which the Court sustained a denial of an adjustment to U.S. purchase price. The plaintiff in that case paid duties on corn imported from the United States into France. After converting the corn to sorbitol, the sorbitol was exported from France. Upon exportation, the plaintiff received a refund from the European Community ("EC") based upon the corn content of the product. 7 CIT at 91, 583 F.Supp. at 601. This procedure required the application of two separate EC regulations. *Id.*

The adjustment in *Roquette* was denied because the "import levy" and the "export levy" embodied in the two regulations were not directly linked to or dependent upon one another; the export levy was due whether or not the corn had been imported. *Id.* The Court agreed with ITA that the words "by reason of exportation" required a sufficient connection between the rebate given and the duties imposed, but found "no direct link between levies and refunds on imported and exported goods." *See also Atcor, Inc. v. United States*, 11 CIT 148, 658 F.Supp. 295 (1987).

Thus, ITA contends it is justified in denying the claimed adjustment because the rebate given under the Regimen was not sufficiently tied to the exportation of the merchandise.

However, *Roquette* possesses several distinguishing factors, thereby lessening any controlling influence on the facts presented here. *Roquette* interpreted 19 U.S.C. § 1677a(d)(1)(*B*), which covers *import duties*, while this case attempts to construe 19 U.S.C. § 1677a(d)(1)(*C*), dealing with *taxes*. Although the application of both provisions hinges on the two payments' connection to export of the subject merchandise, that application depends on a proper reading of the respective regulations governing import duties and taxes. These regulations are not interchangeable, nor does an interpretation of one necessarily compel identical treatment of the other.

In addition, the EC import-export program at issue in *Roquette* involved the use of two provisions, rather than one. 7 CIT at 91, 583 F.Supp. at 601. This two-step procedure offered no direct link between the import levies and the refunds claimed as an adjustment, resulting in the finding above. The instant case concerns the application of a single regulation, the Regimen Transitorio del IVA, a special transition law enacted to evenly and fairly implement Spain's VAT.[16]

Furthermore, the two-step procedure in *Roquette* resulted in a finding that "payment of an import levy is not a precondition for the receipt of an export refund." *Id.* at 91, 583 F.Supp. at 602. Because a French manufacturer received an export refund regardless of whether imported corn made up the sorbitol, or whether the producer paid any import levies, no connection between the two regulations existed. *Id.* Here, plaintiff did pay the IGTE taxes and received a rebate under the Regimen for those taxes *actually* paid.

The Regimen, as demonstrated below, is sufficiently intertwined with the former tax refund available to exporters only (the DFE) to be directly linked to the export of the potassium permanganate disputed here. As such, the tax monies received by plaintiff were rebated "by reason of exportation of the merchandise," and should have been granted as an adjustment under 19 U.S.C. § 1677a(d)(1)(C).

In actual practice, the Regimen is simply a one-year extension of the DFE, after which time the VAT determines exporters' tax liability. The DFE, as noted earlier, applies specifically and *exclusively* to exporters. The Regimen utilizes the terms of the DFE to determine the amount of refunds due under the new VAT. Rebates are divided into a general amount of 6%,

---

**16.** By its own terms, of course, the Regimen involves consideration of the IGTE, Recargo, DFE, and VAT—all separate provisions.

available to all manufacturers, and a supplementary amount for exports over and above the general rebate of 0.1%. In effect, then, exporters received a refund of 6.1%. Not coincidentally, this was the same amount the exporters would have received under the DFE. Documents in the administrative record support this conclusion. *See* PR Doc. 25 at 310, PR Doc. 25 at 311; footnotes 13 and 14, *supra*. Therefore, the rebate formula reflected in the Regimen (and based on the DFE) underscores the substantive interdependence between those two provisions. To hold otherwise, as ITA urges, would elevate form over substance. Exporters continued to receive the full benefits of the DFE under the Regimen, and a direct nexus between the DFE and the Regimen Transitorio exists.

Furthermore, while the Regimen benefits may have also been available to domestic parties who sold goods only in Spain,[17] no export exclusivity requirement attaches to 19 U.S.C. § 1677a(d)(1)(C). The ITA repeatedly stresses that the Regimen rebate was paid to *all producers* who previously paid the IGTE tax, and who still held the merchandise in inventory in 1986, regardless of whether the goods were ultimately exported or sold in the home market. Defendant's Memorandum at 51–52. Even if this were so, the U.S.Code provision merely requires that the rebate be paid "by reason of exportation," not *"only* by reason of exportation." Thus, the restrictive construction of 19 U.S.C. § 1677a(d)(1)(C) advanced by ITA cannot be supported by a plain reading of the statue.

Moreover, ITA itself notes that "Article 72.6 of the Regimen Transitorio provides for a supplementary deduction specifically for export activities." Defendant's Memorandum at 49. Defendant thus impliedly concedes that an adjustment for at least a portion of the tax rebate should have been granted.

Lastly, this Court does not look favorably upon ITA's reversal of this issue in the final determination. Adjustments for the tax rebates were initially granted in the preliminary determination, but later reversed when a Spanish attorney submitted his interpretation of the Regimen's mandates to ITA. Whether this action violated ITA's own policy, as advocated by plaintiff, *see* Plaintiff's Motion for Judgment on the

Agency Record at 33–36, can be debated, but ITA has clearly wavered in its treatment of this issue. Such behavior accentuates the irresolute nature of defendant's position.

Because this Court finds sufficient evidence to support plaintiff's position on their principal claim, an evaluation of their alternative claim regarding a circumstance of sale adjustment is not warranted.

Therefore, the government's decision was unsupported by substantial evidence in the record and was otherwise not in accordance with law. Upon remand, the government is directed to grant the adjustments for the tax rebate claimed under 19 U.S.C. § 1677a(d)(1)(C).

## CONCLUSION

For reasons set forth above, this case is remanded to ITA for verification of information submitted by plaintiff relating to technical services and invoice processing costs.

ITA shall also redetermine whether dumping margins in the instant case arose from a temporary or sustained shift in currency exchange rates between the Spanish peseta and U.S. dollar, and whether application of 19 C.F.R. § 353.60(b) or some other form of adjustment is warranted in either case.

ITA is also directed to grant the adjustment for tax rebates claimed by plaintiff.

ITA shall file the results of the remand proceedings with the Court within 60 days.

SO ORDERED.

This order involves a controlling question of law with respect to which there is substantial ground for difference of opinion. An immediate appeal from this order may materially advance the ultimate termination of this litigation. That question is:

Whether the Court was correct in determining that ITA was required to conduct verification of the claimed adjustments for technical services and invoice processing costs in this administrative review pursuant to 19 U.S.C. § 1677e(b) (1988) given that (1) ITA was requested to verify by an interested party, (2) no verification had taken place during the previous two years, and (3) a minimal indication of changed circumstances justifying verification existed.

SO ORDERED.

---

**17.** Plaintiff asserts that Spain could have enacted two rebate systems, one which temporarily maintained the DFE for exporters, and one which established the Regimen for domestic

producers. Plaintiff's Reply at 38. Spain did not, of course, opt to do so, and this Court will not attempt to second-guess the intent of the Spanish Parliament in creating one system.