INDUSTRIAL QUIMICA DEL NALON, S.A., AS SUCCESSOR TO ASTURQUIMICA, S.A., PLAINTIFF *v*. UNITED STATES, C. WILLIAM VERITY, SECRETARY OF COMMERCE, JAN MARES, DEPUTY ASSISTANT SECRETARY FOR IMPORT ADMINISTRATION, AND WILLIAM VON RAAB, COMMISSIONER OF CUSTOMS, DEFENDANTS

Court No. 88-07-00492

---

(Dated May 24, 1991)

*Kaplan, Russin and Vecchi* (*Dennis James, Jr.* and *Kathleen F. Patterson*) for plaintiff. *Stuart M. Gerson,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, *(Jane E. Meehan), (Dianne McDevitt,* Attorney-Advisor, U.S. Department of Commerce, Of Counsel) for defendants.

## I. Introduction

MUSGRAVE, *Judge:* This case is before the Court for the second time, following a remand to the International Trade Administration (ITA or Commerce) pursuant to our decision in Slip Op. 89–174, *reprinted at* 13 CIT 1055, 729 F. Supp. 103 (CIT 1989), for verification of information relating to technical services and invoice processing costs, and for a determination of whether adjustment was necessary to offset shifts in currency exchange rates, among other things.

The Final Results of Remand (Results) were filed with the Court on September 4, 1990. Plaintiff now asks this Court to remand the case once again with instructions to grant adjustments for technical services costs, for home market invoice processing costs and for the sustained appreciation of the Spanish peseta during the review period. Defendant asks that the Results be sustained.

## II. Technical Services Adjustment

On remand, ITA was directed to verify technical services and invoice processing costs.[1] As part of its verification, ITA agents visited plaintiff's headquarters and factory in Spain. ITA requested documentation to support the technical services and invoice processing costs. However, IQN was unable to provide certain documents, either because they did not exist due to the nature of the relationship between IQN and its end-users, or were lost when Asturquimica merged with its corporate parent IQN some four years prior.

IQN did provide trip reports describing work done by Asturquimica personnel to remedy problems encountered by end users of potassium permanganate (PP). IQN could not document the claim that one technician spent all of his time, and another spent one half of his time on technical services for PP.

### A. *Direct Relation:*

In the Results, ITA stated that there was no direct tie between the technical services personnel salaries and the sales of PP. "Absent such a demonstration, we consider these costs as indirect, particularly because they consist of employees' salaries which IQN would have paid regardless of specific sales being made."[2] Therefore, ITA did not adjust the foreign market value for PP to include the technical services costs.

Defendant argues that technical services must be for services directly related to sales under review, according to *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 592 F. Supp. 1318 (CIT 1984). Plaintiff argues that the technical services were related directly. The government ripostes that the technical services must be more closely related than the instances cited by plaintiff.

---

[1] Slip. Op. 89–174, at 32, 729 F. Supp. at 117.

[2] Results, at 5.

Commerce stated that personnel expenses qualify for technical services adjustment "if, for example, a manufacturer hires workers on a per job basis and incurs expenses for the sales under review."[3] No other "examples" of what ITA considers sufficient to establish a technical services adjustment for salaried employees were cited. ITA apparently limited its interpretation of the personnel costs rule to the one example cited above, facially based on language in the *L.M.I.-La Metalli Industriale, S.p.A. v. United States*[4] and *Rhone Poulenc* cases.

Although defendants claim that the facts herein are "exactly the same" as those in *L.M.I.* and *Rhone Poulenc,* a crucial fact in those two cases is missing from technical costs claimed by IQN. In *L.M.I.,* the adjustment was denied, at least in part, because the company produced numerous products and failed to allocate the personnel costs to the products under investigation. The technical services positions did not differentiate products under investigation and other L.M.I. products. *L.M.I.,* 712 F. Supp. at 965. The IQN subsidiary responsible for the sales and which performed the technical services, however, produced only one product, and any technical costs are therefore attributable to only that product.

Plaintiff correctly points out that *L.M.I.'s* direct relation rule sprang primarily from the need in that case to differentiate between the various products produced and the products under investigation. *See L.M.I.,* 712 F. Supp. at 965, Plaintiff's Reply at 6–10. The *L.M.I.* technicians serviced several products, not just the products under investigation, and Commerce could not apportion the costs between the different products based on the information provided by L.M.I.. *L.M.I.,* 712 F. Supp. at 965.

IQN's predecessor Asturquimica provided the technical services in question, before the merger of the two companies. During the review period, Asturquimica sold and supported only PP. Defendant's reliance on *L.M.I.* is misplaced because there can be no confusion or mistake whether the technical services costs were directly related to sales of PP or some other product, as in *L.M.I.*.

*Rhone Poulenc* is also distinguishable. The Court found that the technical services adjustment was properly denied because the services promoted good will and future sales rather than supported present sales. *Rhone Poulenc,* 592 F. Supp. at 1335. The expenses claimed in *Rhone Poulenc* were for the preparation of technical studies, in house laboratories, and a chemist for on-site technical support. *Rhone Poulenc,* 592 F. Supp. at 1333. Plaintiff's counsel in that case admitted that one of the principal duties of the support staff was "to study new and different uses of ASM for the benefit of Rhone Poulenc's customers. New models of washing machines * * * are studied carefully in order to determine how various detergent formulations will work best in them.'" *Rhone Poulenc,* 592 F. Supp. at 1335. The Court pointed out that the support

---

[3] Results, at 14.

[4] 13 CIT 305, 712 F. Supp. 959 (CIT 1989), *aff'd in part and rev'd in part on other grounds LMI-La Metalli Industriale, S.p.A. v. United States,* 912 F.2d 455 (Fed. Cir. 1990).

group's work was "directed toward research and maximizing future sales," and that the technical studies prepared in response to customer problems were often rewritten in more general terms and provided to potential customers. *Rhone Poulenc,* 592 F. Supp. at 1335.

In both *Rhone Poulenc* and *L.M.I.,* the technical services adjustment was denied because the costs were not directly related to the sales under review. All Asturquimica technical services supported PP sales, insofar as they were not mainly for promotion of goodwill or other factors listed in the *Rhone Poulenc* case. The technicians provided support only after sales were made, and these efforts did not promote future sales, except in the tangential sense that a satisfied customer will likely buy again. The support they provided was more focused than the general overhead and research expenses in *Rhone Poulenc.* As the factual situations differ substantially between this case and the *Rhone Poulenc* and *L.M.I.* decisions, the Court finds the ITA's reliance on those cases in denying IQN's technical services adjustment is not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1990).

B. *On Site Service:*

Although IQN documented its technical services claim through trip reports, salary information, etc., ITA asserts that IQN provided no documentation to support the claim that two technicians spent respectively one hundred percent and fifty percent of their time servicing customer needs. IQN claims it demonstrated to the best of its ability that the technical services were related to the sales which took place during the review period. ITA was not satisfied, even though Asturquimica sold and supported only one product during the review period.

That fact alone is sufficient to convince the Court that the technical services were in fact in support of PP sales. Commerce should be able to determine, from the trip reports and other work product from the technical personnel, whether the percentage of time spent as claimed by IQN is valid. IQN has submitted documentation to support this aspect of its claim, and ITA's statement otherwise, along with the conclusions drawn from it, are unsupported by substantial evidence.

C. *Documentation:*

ITA argues that technical services expenses must be tied to sales through the use of, for example, agreements between IQN and the party receiving the technical services, reports prepared by technical services personnel showing what work was performed, documentation of costs, labor records, records of any payments by IQN's customers, or documentation showing how technical services were incorporated in the sales price. Supp. R. Doc. 4, at 3. However, Commerce in effect required, rather than requested, copies of agreements between IQN and the recipients of the technical services, even though such written agreements did not exist because Asturquimica did not sell PP directly to end users. Without written proof of a legally enforceable agreement between IQN and the end users, ITA would not to grant the technical services adjust-

ment. IQN presented other types of documentation to show that the technical services costs were directly related and were actually performed, but were unable to meet the higher documentation standard imposed after they had made their submission.

Commerce's desire to obtain documentation should not fly in the face of established business practice, and should not be transformed into a do-or-die requirement. As plaintiff points out long term business relationships are often created and developed by oral agreements. Certainly IQN would be foolhardy to ignore end-user problems with its product; satisfied end-users are vital to IQN's long-term relationship with its distributors. This is especially true because PP is fungible and prices are very competitive, making technical services a primary difference between competing brands. When ITA needs information, it may obtain it through alternative means, such as the use of affidavits by relevant personnel. *See Int'l Molder's & Allied Worker's Union v. Marshall*, 643 F.2d 26, 31–32 (1st Cir. 1981) (not an abuse of discretion to rely on unverified statement of company official). Commerce should not rigidly insist that only written documentation will be accepted, where other adequate sources are available.

ITA did not find any agreements between IQN and the parties receiving the technical services, and concluded that "there is no tie between the expenses and specific sales of the merchandise."[5] But ITA misinterpreted and overstated the requirement for "direct relation" outlined in the *Rhone Poulenc* case.

Plaintiff argues, and the Court agrees, that to hold that the technical services must be performed on the specific sales under investigation is to require an impossibility, because technical services are virtually never performed at the same time as the sales themselves. *A.O.C. Int'l, Inc. v. United States*, 13 CIT 716, 721 F. Supp. 314 (1989) held that warranty costs during the review period should be used as the best information available of such costs in general, since the actual costs on the sales during the review period would not be known until after the period of investigation. Plaintiff argues that warranty costs and technical costs are essentially similar. Defendants counter that *A.O.C.* discussed warranty costs; *Rhone Poulenc* and *L.M.I.*, with exactly the same facts should be followed instead.

The technical services performed by IQN are analogous to the warranty costs in *A.O.C.*. Both are post-sale expenses incurred to remedy problems with merchandise. Warranty service is done to remedy defects in a product, while technical service is usually done to resolve problems implementing otherwise satisfactory products. Other than that, and for the purposes of this investigation, the two types of costs are indistinguishable.

---

[5] Results, at 5.

## D. *Salaried Technicians:*

ITA's statement in the Results that "IQN would have paid the salaries of the two technical personnel regardless of whether any sales were made"[6] during the period of review demonstrates the shallowness of the ITA analysis. Logically, if Asturquimica did not sell any of its only product for an entire year, employment of not only technical service personnel, but all personnel would be affected. In the hypothetical period of no sales, salaries might not be paid at all.

The Court agrees with *A.O.C.* concerning adjustments for full-time technical personnel. *A.O.C.* refutes defendants' dubious argument that because the technicians were full-time personnel, the salaries paid would have been paid regardless of whether the sales were made. The Court notes that *Rhone Poulenc* held otherwise. The distinction made there between salaried technicians and those hired on a job-by-job basis is without logical basis as applied to the facts in this case. It would be contrary to common sense to employ an expert for permanganate servicing if end-users were not entitled to service. The fact that in-house servicemen receive fixed salaries does not mean that the cost of that service is a fixed overhead expense which a company must incur irrespective of whether the company is obliged to provide the service. Defendant's argument ignores common business sense, and the technical services costs should not be excluded on that basis.

## E. *Travel Expenses:*

Technician travel expenses were granted in *L.M.I.* but denied to IQN. Commerce granted L.M.I. an adjustment for travel expenses which were directly related to sales of the product under investigation. *L.M.I.*, 712 F. Supp. at 965. The situation in this case is even more compelling than in *L.M.I.*, as the travel expenses were verified and in support of only one product. In fact, ITA made no statement about the travel expenses other than "IQN provided proof of the expense it incurred on travelling to end-users (we noted that IQN had not claimed travel defenses on some tips covered by reports we reviewed)."[7] Although the issue was mentioned again in the summary of IQN's arguments in Comment 1, no other mention was made.[8] Therefore, the denial of the travel expenses adjustment was wholly unsubstantiated and without support. Based on the granting of travel expenses in the *L.M.I.* case, ITA is ordered on remand to grant the adjustment for travel expenses incurred by IQN.

## F. *Effect on Price in Home Market:*

Defendant argues that IQN must show that the technical services costs claimed were factored into the home market price. That statement is in error, for the ITA may, but is not required, to look at any effects

---

[6] Results, at 14.

[7] Results, at 5.

[8] Results, at 11.

which technical support costs have on home market prices. 19 C.F.R. § 353.15(d) (1990), does not limit adjustments to situations where a particular cost to the manufacturer results in an increased price to the home market consumer. Commerce should look at the cost to the manufacturer: "ITA has consistently applied the regulation allowing circumstance of sale adjustments based upon cost to the manufacturer *as well as* the effect on price." *Atlantic Steel Co. v. United States,* 10 CIT 340, 636 F. Supp. 917, 919 (CIT 1986) (citations omitted). Technical support costs are often hidden among other expenses when determining pricing, and the effect on pricing may therefore be muted, or unseen.

### III. INVOICE PROCESSING EXPENSES

A. *Verification:*

Commerce was instructed on remand to verify IQN's claimed invoice processing costs in its home market. IQN supplied calculations which it claimed reproduced to the greatest extent possible the calculations made for its original submission almost four years before. However, the amounts differed from the original amounts on the order of approximately two percent to ten percent. Commerce decided to deny the adjustment entirely, stating that "* * * IQN was given the opportunity at verification to support its claim by any means possible. However, IQN could not produce any documentation to support the amount claimed in its responses."[9] Although IQN could not exactly reconstruct the original amounts, the Court finds that ITA's conclusion that IQN's claim was totally unsupported, is arbitrary, unreasonable, and unsupported by substantial evidence on the record.

ITA states that the purpose of verification is to determine the accuracy of information submitted. If the purpose of verification is to determine accuracy, then the quest should be for accurate numbers. If the original calculations cannot be exactly reproduced four years after they were originally calculated, they may be inaccurate. However, the amounts claimed should not automatically be excluded.

IQN supported the amounts claimed in their original investigation in new calculations, although these calculations did not yield the same results. Given that IQN did provide extensive documentation to back up the calculations ITA's statement that IQN could not produce any documentation to support the amount claimed in its response stretches credibility.[10] IQN clearly did provide information, although not to ITA's satisfaction.

B. *Best Information Available Should Be Used When ITA Cannot Verify Accuracy:*

When IQN could not exactly reproduce the calculations it made in its original submission ITA should have used the best information

---

[9] Results, at 16.

[10] Results, at 16.

available to determine which amounts should be used.[11] ITA could have used either the amounts IQN presented for verification, or it could have used the amounts originally submitted. But 19 U.S.C. § 1677e clearly states that ITA may not ignore such information altogether, where, as in this case, the party has supplied sufficient information in a timely manner. 19 U.S.C. § 1677e(c). Commerce must determine which data is the best information of the invoice processing expenses among the information available to it. *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190 (Fed. Cir. 1990) *(Rhone Poulenc II).*

Therefore, the Court finds that ITA must grant IQN an adjustment for its invoice processing expenses, using the more accurate of either the data originally submitted or the data provided by IQN for verification.

### IV. CURRENCY FLUCTUATION

Plaintiff contends that Commerce improperly failed to lag exchange rates to account for a steady appreciation of the Spanish peseta during the period of review. Both sides agree that ITA was correct to find no temporary fluctuation, and that rates rose steadily and gradually. Plaintiff argues that the rate should be calculated according to the date of sale, and not the date of shipment or export; using the date of export punishes the long-term contractor.

### A. *Lagged Rates Must Be Used Where There Is a Sustained Change in Rates:*

Based on Commerce practice, exchange rates are lagged when a producer can show that it consistently adjusted its prices to account for exchange rate shifts. IQN did change prices on the majority of its sales during the review period, but ITA refused to lag the exchange rate for any sales, because a number of sales were made at the old price. Defendant cites prior ITA determinations as evidence of a practice requiring exporters to increase *all* their prices to account for exchange rate changes. However, none of the determinations cited support that proposition. Despite that failure, the Court finds that ITA acted within its discretion to refuse to grant the currency rate adjustment where a substantial portion (some 40%) of IQN's prices were not changed to account for the rise in value of the Spanish peseta.

---

[11] 19 U.S.C. § 1677e is crystal clear on the procedures to be used in verifying information:

(b) Verification

The administering authority shall verify all information relied upon in making * * *

(3) a review and determination under section 1675(a) of this title * * *.

* * * If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action, which may include, in [final determinations], the information submitted in support of the petition.

(c) Determinations to be made on best information available

In making their determinations under this subtitle, the administering authority and the Commission *shall,* whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, *use the best information otherwise available.*

19 U.S.C. § 1677e(b)–(c) (1990) (emphasis added).

248

B. *Long Term Contracts:*

Although plaintiff asserted that IQN could not change the other 40% of its prices because of long term contracts made by its distributors, the Court finds that IQN bore the risk of shifting exchange rates by agreeing to honor its distributors' lower prices. As Judge DiCarlo stated recently in *Toho Titanium Co. v. United States,* 14 CIT 500, 743 F. Supp. 888 (CIT 1990):

> Toho chose to enter into a three-year sales contract that, by setting fixed prices, did not adequately provide for the changes in the value of the yen. Therefore, Toho bore the risk * * * that [currency] appreciation could lead to a higher dumping margin.

*Toho Titanium,* 743 F. Supp. at 893. For these reasons, the Court finds that the ITA did not abuse its discretion in refusing IQN's claimed currency rate adjustment.

V. Conclusion

As a result, this case is remanded to the International Trade Administration for redetermination in accordance with this opinion.