**BROTHER INDUSTRIES, LTD. and Brother International Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**Smith Corona Corporation, Intervenor–Defendant.**

No. 88–11–00860.

United States Court of International Trade.

July 12, 1991.

Tanaka Ritger & Middleton, H. William Tanaka, Patrick F. O'Leary and Alice L. Mattice, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Jane E. Meehan, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Pamela A. Green,

Washington, D.C., of counsel, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Todd C. Fineberg, Washington, D.C., for intervenor-defendant.

## OPINION & ORDER

AQUILINO, Judge:

The plaintiffs have interposed a motion for judgment on the record compiled by the International Trade Administration, U.S. Department of Commerce ("ITA") *sub nom. Portable Electric Typewriters From Japan Final Results of Antidumping Duty Administrative Review*, 53 Fed.Reg. 40,926 (Oct. 19, 1988). As indicated, the review was carried out under the aegis of an antidumping-duty order for portable electric typewriters ("PETs") from Japan [1] and covered the years May 21, 1982 to May 20, 1983, May 21, 1983 to May 20, 1984, May 21, 1984 to April 30, 1985, and May 1, 1985 to April 30, 1986. It resulted in dumping margins for those respective periods of 0.62, 0.32, 0.44 and 4.00 percent for Brother PETs.

Nonetheless, the plaintiffs take the position that the those results are unsupported by substantial evidence on the record and otherwise not in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B). Their motion alleges that the ITA erred in numerous ways, including (1) applying section 615 of the Trade and Tariff Act of 1984 retroactively to shipments exported before the act's effective date; (2) disregarding a supplemental submission of sales information and relying instead on best information available; (3) failing to adjust for appreciation in value of the Japanese yen in 1985–86; (4) failing to adjust for the full amount of a claimed rebate in computing foreign-market values; (5) double counting corporate advertising expenses in computing exporter sales prices; (6) failing to make a circumstance-of-sale adjustment for certain direct expenses and deducting an incorrect amount of indirect expenses in the exporter-sales-price offset adjustment; (7) double counting packing expenses in constructing values; (8) deducting an incorrect exporter-sales-price offset adjustment as a result of a computer programming error; (9) double counting certain export sales; (10) using incorrect sales dates, exchange rates, and foreign-market values in calculating the dumping margins; (11) failing to delete erroneous home-market sales information from the computer data base; and (12) failing to adjust for home-market commissions in computing foreign market values.

As discussed hereinafter, the defendant acquiesces in remand on some of these points and opposes the others, whereas the intervenor-defendant takes the position that relief is not necessary. Jurisdiction of the court is pursuant to 28 U.S.C. § 1581(c).

## I

The Trade Agreements Act of 1979, 19 U.S.C. § 1677b(a)(1) (1980), provided that, in general, the foreign market value of imported merchandise was to be the price, at the time of exportation of such merchandise to the United States, at which it was sold or offered for sale in the principal markets of the country from which exported. Section 615(1) of the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948, 3036–37, deleted the time-of-exportation clause, amending section 1677b(a)(1) to state that the foreign market value of imported merchandise

shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section with respect to such person—

(A) at which such or similar merchandise is sold, or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption. . . .

---

**1.** *See* 45 Fed.Reg. 30,618 (May 9, 1980).

In other words, while time remained an element of this provision, it changed from the moment of exportation to the moment of first sale within the United States, references which are not necessarily synchronous.

In the determination at bar, the ITA relied on this change in reviewing plaintiffs' entries, those which occurred before the enactment in 1984 as well as those thereafter. Brother objected to this approach for merchandise exported prior to October 30, 1984. The agency overruled the objection, *Comment 76,* responding that it

> based exchange rate calculations and home market comparison sale selections for sales date rather than export date. This is consistent with the Depa[r]tment's practice in conducting administrative reviews which were initiated after and covered sales prior to October 30, 1984. The initiation notices of antidumping duty administrative review for the periods subject to this review were published on June 23, 1986 and July 9, 1986. Also, the use of sale date rather than export date is consisitent [*sic*] with the final results of the administrative review of this case covering the 1981–82 period (52 FR 1504, January 14, 1987).

53 Fed.Reg. at 40,936. The plaintiffs renew their objection now.

### A

■■■ If an act is silent or ambiguous with respect to a specific issue, the question for the court is whether or not an agency's approach is based on a permissible construction of the statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). In arguing in the affirmative, the defendant relies on section 626 of the 1984 act, providing, in pertinent part:

EFFECTIVE DATES.

(a) Except as provided in subsections (b) and (c), this Act, and the amendments made by it, shall take effect on the date of the enactment of this Act.

(b)(1) The amendments made by sections 602, 609, 611, 612, and 620 shall apply with respect to investigations initiated by petition or by the administering authority under subtitles A and B of title VII of the Tariff Act of 1930 on or after such effective date.

(2) The amendments made by section 623 shall apply with respect to civil actions pending on, or filed on or after, the date of the enactment of this Act.…

Since 615 was not included among those sections specified for prospective application, the defendant argues that section 626(a) controls: "if section 626(a) were read any differently than that the amendments are to take effect immediately with respect to all administrative proceedings, then section 626(b) would be superfluous." [2]

The plaintiffs counter that this is not only impermissible *post hoc* rationalization, it amounts to a concession that the ITA response to Comment 76, quoted above, is "not colorable in light of the language of … Section 626(b)(1)." [3] And it is that response, the plaintiffs argue, which renders that section superfluous because every provision of the 1984 act is already applicable to proceedings begun on or after its effective date. Since no part of a statute should be construed as superfluous if there is an alternative interpretation, the plaintiffs conclude that the proper reading of section 615 is that it took effect for entries on or subsequent to enactment.

However, to the extent that the defendant regards the review proceedings as begun after the act's effective date, it is not inconsistent with the response to Comment 76 for the defendant to argue that section 615 applied. While that stance may tend to make section 626(b)(1) unnecessary, as the plaintiffs point out, their preferred interpretation would not logically follow even if defendant's original position were untenable. The 1984 act states only that it

---

**2.** Defendant's Memorandum in Partial Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record, p. 17.

**3.** Plaintiffs' Response to Defendant's and Defendant–Intervenor's Memoranda in Opposition to Plaintiffs' Motion for Judgment on the Agency Record, p. 15.

is to take effect as of the enactment date. Prospective implementation is explicit in 626(b)(1), but that subsection makes no mention of section 615, which therefore took effect on the enactment date. *Washington Red Raspberry Comm'n v. United States*, 11 CIT 173, 182, 657 F.Supp. 537, 545 (1987), *aff'd*, 859 F.2d 898 (Fed.Cir. 1988).

On another tack, the plaintiffs allege that the ITA's reliance on section 615 herein is at odds with its practice of not applying that section in reviews of entries predating the 1984 act. They have submitted two attorney affidavits in support of their position.[4] One points to a preliminary review proceeding of tapered roller bearings covering the period April 1, 1974 through March 31, 1979 and reported on at 54 Fed. Reg. 12,938 (March 29, 1989), in which "the ITA used 'shipment date' to determine currency conversions and foreign market values" for a responding firm with which the affiant claims familiarity. Plaintiffs' Response, Appendix 3 at p. 2. The other affidavit asserts that the proceedings *sub nom. Television Receiving Sets, Monochrome and Color, From Japan*, 50 Fed. Reg. 24,278 (June 10, 1985), and *Portable Electric Typewriters From Japan*, 52 Fed. Reg. 1,504 (Jan. 14, 1987), covered pre–1984 review periods, were initiated prior to the effective date of the 1984 act but completed afterwards, and relied on the 1979 act in calculating foreign-market values for the respective goods and comparing them with exporters' sales prices. *See* Plaintiffs' Response, Appendix 2.

On their face, these references do appear to support the notion of different ITA approaches for review proceedings begun before and after the 1984 act, but the plaintiffs state at page 19 of their memorandum that the "1982–1983, 1983–1984 and 1984–1985 period reviews were all initiated after the effective date of the 1984 Act". Their reply memo, on the other hand, backpeddles to contend that at least two of the reviews had been initiated automatically prior to the effective date. In either event, when the 1984 act eliminated automatic initiation, the ITA allowed parties to request review for all outstanding orders for periods for which proceedings had not been completed. *See* 50 Fed.Reg. 32,556, 32,557 (Aug. 13, 1985).

The plaintiffs argue that the requested ensuing proceedings were not new, just "reinitiated" old ones, and that reviews of entries begun prior to the 1984 act ought to have been carried out according to the contemporaneous definition of foreign-market value. However, whether that act affected a "right" to, or a "remedy" of, automatic review[5], and whether requests made in accordance therewith are couched as either for non-discontinuance of proceedings started automatically under prior law or for initiation, plaintiffs' position focuses on whether or not the ITA's approach was in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B). In this court's judgment, the answer thereto hinges on whether the 1984 act countenanced determination of the review proceedings at bar based on the statutory change to 19 U.S.C. § 1677b(a)(1), *supra*. On this issue, the

---

**4.** The intervenor-defendant has filed a motion to strike the affidavits as an attempt to expand the administrative record beyond that allowed under 19 U.S.C. § 1516a(b)(2)(A), citing, *inter alia, Ipsco, Inc. v. United States*, 13 CIT ——, ——, 715 F.Supp. 1104, 1109 (1989); *Armco Inc. v. United States*, 13 CIT ——, 712 F.Supp. 214 (1989); and *PPG Industries, Inc. v. United States*, 13 CIT ——, 708 F.Supp. 1327 (1989). It claims that, like a letter in *Ipsco* relating to an end-use certification procedure employed by the ITA after conclusion of the agency proceeding, "these affidavits containing attorneys' recollections of agency practice were not presented until after the proceedings were over and the record was closed." Intervenor–Defendant's Motion to Strike, p. 3.

This is true, but the court considers the affidavits to be within the realm of permissible legal argument under 19 U.S.C. § 1516a(b)(1)(B). When the agency rationale for its determination is consistency with prior administrative decisions, the nature of the methodology underlying them has bearing upon whether the determination was in accordance with law. In short, intervenor-defendant's motion to strike must be, and hereby is, denied. *Cf. Hercules, Inc. v. United States*, 11 CIT 710, 735, 673 F.Supp. 454, 476 (1987).

**5.** *See generally Interredec, Inc. v. United States*, 11 CIT 45, 652 F.Supp. 1550 (1987).

court cannot conclude that it was not in accordance with law for the ITA to have proceeded as it did. That is, the agency's approach was based upon a permissible construction of the statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., supra.*

## B

■ The plaintiffs claim that they relied upon the 1979 definition of foreign-market value in setting their export sales prices, which "compliance efforts" were unfairly nullified by the ITA's subsequent determination. In other words, the plaintiffs complain that the agency approach affected conduct in reliance upon existing law. Plaintiffs' Memorandum, p. 21. They refer to *Zenith Radio Corp. v. United States,* 1 CIT 180, 184, 509 F.Supp. 1282, 1286 (1981), and *Cementos Guadalajara, S.A. v. United States,* 12 CIT 307, 328, 686 F.Supp. 335, 351-52 (1988), *aff'd,* 879 F.2d 847 (Fed.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990), for the proposition that liability for duties attaches at entry. They assert that entries must be liquidated according to the law in effect then. *See* Plaintiffs' Response, p. 16, n. 8.

*Cementos* involved the question of whether a nation which becomes a "country under the Agreement" within the meaning of 19 U.S.C. § 1671(b) is then entitled to an injury determination by the International Trade Commission pursuant to section 1671(a) even as to pre-existing, unliquidated entries before countervailing (or antidumping) duties could be imposed on them. The resolution of that issue, as affirmed by the court of appeals, focused on the fact that liability for unfair-trade duties attaches at entry, and thus that is the time which determines applicable law. *Zenith* is to the same effect. However, the dispute here is not with the underlying antidumping-duty order. Rather, the point of reference of this action is subsequent administrative review. *Cf. Al Tech Specialty Steel Corp. v. United States,* 6 CIT 245, 575 F.Supp. 1277 (1983), *aff'd,* 745 F.2d 632

(Fed.Cir.1984). Entry is not *per se* determinative of the law governing that process, which, by nature, is *ex post facto. Canadian Fur Trappers Corp. v. United States,* 884 F.2d 563, 568 (Fed.Cir.1989), for example, affirmed reliance on a statutory amendment requiring collection of accrued interest. The amendment had been enacted after entry but before final assessment of duties. Accrual was included, albeit from the date of change rather than of entry.

It is true, as the defendant points out, that the law in effect at the time of a court's decision is to be applied, unless the result in doing so would produce "manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). And immediate application is the rule where new law affects only procedure or remedies. *See, e.g., Friel v. Cessna Aircraft Co.,* 751 F.2d 1037, 1039 (9th Cir.1985); *Monsanto Co. v. United States,* 12 CIT 949, 951, 698 F.Supp. 285, 288 (1988). *Cf. United States v. Kairys,* 782 F.2d 1374, 1381 (7th Cir.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). On the other hand, it is also true that there has been general rejection of retroactive application. *E.g., Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) and also *id.* at 223 (Scalia, J., concurring) ("Retroactive legislation has always been looked upon with disfavor, ... and even its constitutionality has been conditioned upon a rationality requirement beyond that applied to other legislation"); *Rhone Poulenc, Inc. v. United States,* 14 CIT —, —, 738 F.Supp. 541, 543 (1990). Hence, the "first rule" of statutory construction continues to be stated to be that

legislation must be considered as addressed to the future, not the past.... [R]etrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."

*United States v. Security Industrial Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982) (citation omitted).

The plaintiffs contend that the 1984 act lacks clarity on this count.[6] When the intention of the legislature is not manifest,[7] the nature of the interest with which interference is claimed must be evaluated. *See, e.g., Bradley v. Richmond School Board, supra; E.L. Wiegand Division, Emerson Electric Co. v. N.L.R.B.*, 650 F.2d 463 (3d Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982); *Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796 (8th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982). The plaintiffs argue that an exporter's good faith efforts to monitor pricing

> is precisely the conduct the antidumping laws are designed to encourage.... Therefore, in the absence of a specific provision to the contrary, the 1984 Act must be read to prohibit retroactive application—particularly where, as here, the amendment affects the behavior of " 'practical' men" in the daily course of their business.[8]

The defendant responds that a

> vested right is more than a mere expectation based upon the anticipated continuance of the existing law.... It is well-

established that no one has a vested right to trade with foreign nations and that no one has a legal right to the maintenance of an existing rate of duty. Because importers, thus, have no vested legal right to have antidumping duties assessed upon the basis of any particular methodology, plaintiffs had no vested right which was affected by section 615.

Defendant's Memorandum, pp. 20–21 (citations omitted). *See also id.* at 17–18.

Methodology is the means by which an agency carries out its statutory mandate and, as such, is generally regarded as within its discretion. But methodology still must be lawful, which is for the courts finally to determine. *See, e.g., IPSCO, Inc. v. United States*, 12 CIT 359, 687 F.Supp. 614, *remanded*, 12 CIT 1128, 701 F.Supp. 236 (1988), *aff'd after remand*, 13 CIT ——, 710 F.Supp. 1581 (1989), *rev'd in part*, 899 F.2d 1192 (Fed.Cir.1990); *Uddeholm Corp. v. United States*, 11 CIT 969, 676 F.Supp. 1234 (1987); *British Steel Corp. v. United States*, 10 CIT 224, 632 F.Supp. 59 (1986). *Cf. Matsushita Electric Industrial Co. v. United States*, 861 F.2d 257, 260 (Fed.Cir.1988); *PPG Industries, Inc. v. United States*, 14 CIT ——, ——, 746 F.Supp. 119, 127–32 (1990). Indeed, the law the ITA applies guards against unlawful method while also guarding

---

**6.** Ambiguity in the language of this statute has given rise to other litigation, including, for example, over the intendment of "investigations" as originally enacted in section 626(b)(1). *See, e.g., Al Tech Speciality Steel Corp. v. United States*, 745 F.2d 632 (Fed.Cir.1984); *Interredec, Inc. v. United States, supra.*

Elsewhere, language identical in substance to section 626(a) has been construed as indicating congressional intent for prospective application. *E.g., Franklin v. State of New Mexico*, 730 F.2d 86 (10th Cir.1984).

**7.** All the definitional sections of H.R. 4784, which contained the precursor to section 626 of the 1984 act, were made prospective. After passage in the House of Representatives, the Senate considered H.R. 4784 along with other bills and proposed several amendments. One proposal was an amendment to the definition of foreign-market value (ultimately section 615 of the 1984 act), although no corresponding amendment to section 626 explicitly making 615 prospective as with other definitional sections was proposed. *See* 130 Cong.Rec. 29,410, 29,411, 29,432–33

(Oct. 3, 1984). When H.R. 4784 was sent back to the House, it was incorporated into H.R. 3398, which ultimately became Pub.L. No. 98–573, 98 Stat. 2948 (Oct. 30, 1984).

**8.** Plaintiffs' Memorandum, p. 25 (citation omitted). The reference to "practical men" comes from *National Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1555 (Fed.Cir.1988). However, that case involved Customs enforcement in circumstances by no means free of other considerations. *See, e.g., Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60, 81 L.Ed.2d 42 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant"), citing *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973), and *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 383, 68 S.Ct. 1, 2–3, 92 L.Ed. 10 (1947).

against injurious unfair foreign competition.

The fundamental reason for prospective application is to avoid "the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed." *Union Pacific R.R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913). *See also Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Friel v. Cessna Aircraft Co., supra; Daughters of Miriam Center for the Aged v. Mathews,* 590 F.2d 1250 (3d Cir.1978); *N.L.R.B. v. St. Luke's Hospital Center,* 551 F.2d 476 (2d Cir. 1976). An outstanding antidumping-duty order indicates to the world that covered imported merchandise is subject to duties thereunder, assessed according to law. As has been stated,

> Customs law has ceased to be a matter of domestic interest only.... It is a matter of international concern. This is particularly true of antidumping and countervailing duties. They have long been matters dealt with in the GATT, and it has been difficult to reconcile our, at times, drastic laws with internationally recognized standards of fair dealing. Congress has undertaken to master this problem in part by codifying procedures other countries can notice and rely on, and in part by "judicializing" the process so that procedural, as well as substantive, rights can be recognized and enforced in courts.[9]

Reliance cannot be presumed, however. The standard for this court's review of a claim thereof is "substantial evidence on the record", 19 U.S.C. § 1516a(b)(1)(B). The plaintiffs state:

> ... As explained at the ITA hearing, Brother has an established practice of monitoring its export prices to ensure compliance with the antidumping law. Logically, the only guidance Brother can have in this process is the law *in effect at the time* the pricing decisions are made. Thus, in May 1982, almost two and one-half years before the 1984 Act, BIL set its export prices to BIC by comparison with its home market prices as of the *date of export,* using the appropriate exchange rate in effect at the time. BIL also used the export date to determine the "most similar" home market model for purposes of the fair value calculation. While the transfer price to BIC is not the basis of the United States price ... calculations, this methodology provided reasonable certainty that dumping would be avoided if the transfer price was set *high* enough.... [W]hen the ITA ... based FMV on *sales* date rather than export date, BIL's antidumping price compliance efforts were unfairly nullified. Depending on the sales date, dumping margins appeared where little or no margin previously existed.[10]

No other citations or support are provided, and independent examination of the record has failed to discover proof of Brother reliance on the U.S. law in setting prices.[11]

9. *Samsung Electronics Co. v. United States,* 873 F.2d 1427, 1431 (Fed.Cir.1989) (Nichols, J. dissenting).

10. Plaintiffs' Memorandum, pp. 24–25 (emphasis in original), referring to Brother's pre-hearing brief to the ITA, Confidential Document ("ConfDoc") 161, p. 13.

11. A purchasing agreement concluded between BIL and BIC prior to the effective date of the 1984 act and included in plaintiffs' confidential questionnaire response for the 1984–85 period incorporated two separate listings of prices for PETs by reference. *Compare* ConfDoc 42, Appendix 1, arr. 2 *with id.,* Appendixes 5–A *and* 5–B. The first list covered prices for the period beginning prior to and ending about a month beyond the effective date of the 1984 act and

listed each model of PET available for export to the United States. Next to each model were listed the export price (in dollars) and the date from which the listed price went, or would go, into effect, invariably one of three dates between 1983 and 1984. The second price list was published just after the 1984 act took effect and appeared in the same format as the first. Different model numbers were listed, although the total number of PETs remained the same. Of the models the same on either list, some revisions to prices were apparent (downward, no less) and made effective as of future dates certain, often well after October 30, 1984.

On its face, this record is not adequate to support the contention that the revisions were responsive to the U.S. law as opposed to other conditions.

In this absence of substantial evidence on the record, the plaintiffs have failed to state a claim upon which relief can be granted.

## II

▓▓▓ The plaintiffs also complain that the ITA disregarded information voluntarily submitted to supplement an inadequate questionnaire response for 1984–85. As required, Brother had provided information on both computer tape and printout. *See* Record Document ("R.Doc") 176. Allegedly, preparation of the tape had resulted in an inadvertent deletion of sales data [12] for three PET models in the timely submission. Over a year later, the plaintiffs discovered the omission and brought it to the attention of the case analyst by supplying a "correction" to their computer tape. R.Doc 428. Thereafter, the ITA published the preliminary results, which stated:

On February 18, 1988, Brother submitted data for previously unreported U.S. sales for three models for the [1984–85] period. Because the submission was untimely, we applied the best information available to these sales. The best information available was based on sales for which Brother reported timely information.

53 Fed.Reg. 20,353, 20,354 (June 3, 1988). The agency's final determination states:

Although the Department does have discretion to use in unusual situations information untimely submitted, respondents making untimely submissions run a high risk that the Department will use the best information otherwise available to calculate dumping margins. Absent this approach, respondents would have no incentive to make timely submissions. In this case, time constraints alone are sufficient to prevent us from using Brother's late-submitted sales data.

... We continue to use the best information otherwise available only for the sales in question, and not for all sales for the 1983–84 and 1984–85 periods. Furthermore, we agree with Brother that the margin applied to these sales could serve as a disincentive for respondents otherwise willing to volunteer information inadvertently omitted from the original response. For the final results, we have applied the highest weighted-average margin found to exist for a responding firm during the 1984–85 review period to Brother's late-submitted purchase price sales.

53 Fed.Reg. at 40,928–29.

Section 1677e of Title 19, U.S.C. requires resort to the best information otherwise available whenever a party "refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation". The question is whether that section controlled the circumstances at bar.

On the one hand, the ability of the agency to set and enforce its own deadlines is an area well within its discretion [13], and a party has an obligation to file by ITA deadlines or to obtain extensions of time. *Cf.* 19 C.F.R. §§ 353.31, 355.31 (1990). The law does not permit a party to pick and choose information it wishes to present to the agency, and a deficient submission may lead to an undesired result. *See, e.g., N.A.R., S.p.A. v. United States*, 14 CIT ——, 741 F.Supp. 936 (1990). On the other hand, 19 C.F.R. § 353.51(b) (1988) offered an

opportunity to correct inadequate submissions ... if the corrected submission is received in time to permit proper analysis and verification of the information concerned; otherwise no corrected submission will be taken into account.[14]

---

**12.** They covered model 5307 for February and March 1984 and models 5337 and 5366 for March and July 1984. *See* R.Doc 428. According to the plaintiffs, the computer tape originally contained double input on sales. The plaintiffs allege that, upon discovering and attempting to correct this error, they then inadvertently deleted those sales entirely. *See* ConfDoc 161, Exhibit 17.

**13.** *See, e.g. Rhone Poulenc, Inc. v. United States,* 13 CIT ——, 710 F.Supp. 341 (1989), *aff'd,* 899 F.2d 1185 (Fed.Cir.1990).

**14.** The ITA has stated that it "normally allows minor revisions to questionnaire responses after the preliminary determination and during verification". *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From*

Obviously, timeliness relates to the ITA's ability to comprehend information before rendering a determination. Presumably, a "correction" correlates to matter already part of the record while an "omission" lacks such correlation. That is, a submission of previously-omitted information may well be the equivalent of entirely new data and beyond the ability of the agency to digest and incorporate. In this instance, the ITA apparently regarded plaintiffs' voluntary submission as within the camp of correction. The plaintiffs point out that 105 days elapsed before publication of the preliminary determination, and they argue that this amount of time negated any claimed inability to consider their data.

On judicial review of an original investigation, the timeliness of a submission has been evaluated from the perspective of receipt. *See, e.g., Floral Trade Council of Davis, California v. United States*, 13 CIT ——, ——, 704 F.Supp. 241, 243 (1989). Here, of course, a subsequent administrative review is involved, and the absence of a date certain for publication of the preliminary determination at the time of receipt puts the matter on a somewhat different footing. Nonetheless, in view of the significant lapse of time prior to plaintiffs' discovery and then submission, the court cannot conclude that the agency abused its discretion in not considering the proffered data. On the other hand, an inability to produce information caused by the ITA itself has warranted reconsideration [15], as have timeliness issues of the agency's own making. *See, e.g., Daewoo Electronics Co. v. United States*, 13 CIT ——, ——, 712 F.Supp. 931, 945 (1989).

Be that as it may, the ITA strives for accuracy and is aware that its own errors can call for correction without judicial intrusion. *See, e.g., Koyo Seiko Co. v. United States*, 14 CIT ——, ——, 746 F.Supp. 1108, 1109 (1990). Moreover, court-ordered amendments of ministerial errors are not destructive of the ITA's ability to manage its proceedings. *See, e.g., Ipsco, Inc. v. United States*, 14 CIT ——, Slip Op. 90–37,

1990 WL 51968 (April 16, 1990); *Daewoo Electronics Co. v. United States, supra; Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT ——, 704 F.Supp. 1114 (1989), *aff'd*, 901 F.2d 1089 (Fed.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990); *Timken Company v. United States*, 7 CIT 319, 320, 1984 WL 3725 (1984). Finally, even a party's ministerial or clerical errors have warranted correction where remand has been necessary on other grounds. *E.g., Koyo Seiko Co. v. United States, supra; Serampore Industries Pvt. Ltd. v. U.S. Dep't of Commerce*, 12 CIT 825, 834, 696 F.Supp. 665, 673 (1988).

In this case, since the ITA apparently regards plaintiffs' submission as mere clerical correction, and since remand is necessary on other grounds, discussed hereinafter, the court deems it appropriate for the agency to attempt to take plaintiffs' data into account. However, this decision is not to be construed as undermining the ITA's authority to disregard untimely information. *See, e.g., Koyo Seiko Co. v. United States*, 14 CIT at ——, 746 F.Supp. at 1110 ("if determinations were constantly subject to amendment, 'it would be difficult to answer the question as to when a *final* determination would ever be made' "), quoting *Badger–Powhatan, Div. of Figgie Int'l, Inc. v. United States*, 10 CIT 241, 245, 633 F.Supp. 1364, 1369 (1986) (emphasis in original). *See also Chinsung Industrial Co. v. United States*, 13 CIT ——, 705 F.Supp. 598 (1989); *Uddeholm Corp. v. United States, supra.* But it would also be paradoxical to remand when the ITA commits clerical errors yet deny reconsideration at the same time of similar errors by others.

### III

■■■ The plaintiffs allege that the ITA's 1985–86 determination is distorted by "unprecedented and rapid" changes in the exchange rate which should have been ac-

---

the *Federal Republic of Germany*, 54 Fed.Reg. 18,992, 19,034 (May 3, 1989).

15. *See, e.g., Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed.Cir.1990).

counted for under 19 C.F.R. § 353.56(b)[16]. This issue apparently was not raised during the proceedings below, and the defendant and intervenor-defendant contend that the plaintiffs therefore may not raise the issue now before the court.

However, among the exceptions to the requirement of exhaustion of administrative remedies are "judicial interpretations of existing law after decision below and pending appeal—interpretations which if applied might have materially altered the result." *Hormel v. Helvering*, 312 U.S. 552, 558–59, 61 S.Ct. 719, 722, 85 L.Ed. 1037 (1941); *PPG Industries, Inc. v. United States*, 12 CIT 1189, 1192–93, 702 F.Supp. 914, 916 (1988). *Industrial Quimica del Nalon, S.A. v. United States*, 13 CIT ——, 729 F.Supp. 103 (1989), represents such an interpretation. In that case, the court concluded that it was not in accordance with law for the ITA to restrict application of the special rules only to fair-value investigations.

The defendant, disagreeing with that decision, contends that those rules are inapplicable herein because a party subject to an antidumping-duty order is on notice that its prices will be monitored thenceforth. That argument was addressed at length in *Industrial Quimica*, 13 CIT at ——, 729 F.Supp. at 109–14, and *stare decisis* counsels reliance on the court's reasoning in this action. *See, e.g., Krupp Stahl A.G. v. United States*, 15 CIT ——, Slip Op. 91–31, 1991 WL 62139 (April 19, 1991), and citations therein. As for notice, it can be expected that those covered by an antidumping-duty order will factor their expectations as to future rates of exchange into their pricing. And it is rational to presume that during subsequent administrative review currency adjustment perceived as necessary has already been made.

This being a presumption however, it is rebuttable. As stated in *Industrial Quimica*, "[i]f a factor is truly beyond the control of the exporter, [it] cannot, by definition, make adjustments to compensate. The rationale of the special rule, then, should apply whether the proceeding is a dumping determination or a subsequent review." 13 CIT at ——, 729 F.Supp. at 112. *See also Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 933 (Fed.Cir. 1984). In other words, that parties to a review are presumed to have been on notice is not a valid reason not to consider whether exchange rates were in fact beyond their ken. On the other hand, this does not mean that the ITA must make an adjustment every time a claim therefor is raised. Claimants have to demonstrate on the record that the exchange-rate behavior was beyond their ability to compensate. *See, e.g., id.* and *Budd Company, Wheel & Brake Div. v. United States*, 14 CIT ——, ——, 746 F.Supp. 1093, 1100 (1990). *Cf. Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 10 CIT 424, 430, 640 F.Supp. 255, 260 (1986).

The plaintiffs refer, for example, to a report that the United States, Japan, West Germany, France and the United Kingdom were going to act in concert "to drive the dollar down". Plaintiffs' Memorandum, p. 41, citing The New York Times, Sept. 23, 1985, at A1, col. 6. Such an announcement appears, however, to add to, not lessen, the burden of demonstrating an inability to contemplate exchange rates as they developed. Nevertheless, the plaintiffs claim to have been under binding contracts with set prices.

Of course, parties are free to contract as they see fit, but their arrangements are still governed by the trade laws, and unfulfilled expectations may not be grounds for adjustment, although the court notes in

---

**16.** In 1988, the regulation provided:

    (b) *Special rules for fair value investigations.* For purposes of fair value investigations, manufacturers, exporters, and importers concerned will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. Where prices under consideration are affected by temporary exchange rate fluctuations, no differences between the prices being compared resulting solely from such exchange rate fluctuations will be taken into account in fair value investigations.

This provision was subsequently superseded by 19 C.F.R. § 353.60(b). *See* 54 Fed.Reg. 12,742, 12,789 (March 28, 1989).

passing that the ITA has been responsive to settlement of expectations in advance of sale. *E.g., Antifriction Bearings From the Federal Republic of Germany*, 54 Fed. Reg. 18,992, 19,085–86 (May 3, 1989). There, the agency allowed a circumstance-of-sale adjustment upon a demonstration of the exchange rate projected in a forward hedging contract. The prices considered therein were shown to have been directly related to a rate certain. Be that as it may, suffice it to state for the moment that the plaintiffs are entitled to an opportunity to attempt to persuade the ITA of circumstances beyond their contemplation and for which adjustment would be appropriate. In granting remand to provide such an opportunity, it is useful to recite *Industrial Quimica del Nalon, S.A. v. United States*, 13 CIT at ——, 729 F.Supp. at 114:

> ... The Court trusts that upon remand, ITA will redetermine whether dumping margins in the instant case arose from a temporary or sustained shift in currency exchange rates, and whether application of the special rule or some other form of adjustment is called for under either circumstance.

## IV

■ The plaintiffs also complain that the full amount of a claimed rebate was not deducted in the foreign-market-value calculations for the 1984–85 and 1985–86 review periods. *Compare* Intervenor–Defendant's Memorandum, p. 55 *with* Plaintiffs' Response, p. 46. On its part, the defendant maintains that it "deducted from foreign market value all rebates to home market customers, including the dealers period rebate, reported by Brother." Defendant's Memorandum, p. 54. *See generally id.* at 54–56. *See also* 53 Fed.Reg. at 40,937, *Comment 83.*

However, this position is not supported by substantial evidence on the record. As the plaintiffs point out, their claim was verified by the ITA [17], but the adjustments do not appear as claimed in the agency's

computer printouts for the final foreign-market-value calculations. *See also* Plaintiffs' Confidential Memorandum, Attachment 12. The problem resulted from a computer programming error or from plaintiffs' failure to put the rebate figures onto the computer tape. In either event, the plaintiffs spotted the problem at the first available opportunity (upon release of the ITA's preliminary computer print-outs) and brought the matter promptly to the agency's attention, ConfDoc 161, p. 59. *Cf. Koyo Seiko Co. v. United States* and *Serampore Industries Pvt. Ltd. v. U.S. Dep't of Commerce, supra.* The ITA agreed that a deduction for the dealers' period rebates had been omitted and stated that it had "made the appropriate adjustments to FMV for the final results." 53 Fed.Reg. at 40,937. *Cf.* ConfDoc 151, p. 3. If, as appears, this is not the case, the full amount of the rebates should be deducted during remand.

## V

The defendant agrees with the plaintiffs that the final determination contains a number of other ministerial errors supporting remand for correction. However, in some instances the defendant disagrees that relief should be tailored in the form the plaintiffs request, while the intervenor-defendant opposes remand for various reasons.

Due to the tripartite nature of a case like this, remand is not the automatic result of government acquiescence therein. *See, e.g., Smith Corona Corporation v. United States*, 11 CIT 954, 678 F.Supp. 285 (1987).

## A

■ The ITA apparently agrees that its determination contains double deduction of plaintiffs' corporate advertising expenses for each review period. The correct approach upon remand, the plaintiffs assert, would be to treat those expenses as indirect, as claimed in their questionnaire responses[18]. The defendant contests such

**17.** *See* ConfDoc 90, p. 8.

**18.** ConfDoc 2, pp. 10, 12 (1982–83); R.Doc 29, pp. 10, 12 (1983–84); ConfDoc 4, p. 12 (1984–85)

treatment on the ground that it was not pressed below and is being raised here for the first time. That is, in verifying the questionnaire responses, the ITA determined that the expenses in question were direct, but it then proceeded to take them into account twice, once as part of corporate overhead and once as separate, direct. It is this mistake which the defendant offers to rectify.

The doctrine of exhaustion requires that an administrative agency have been presented with an opportunity to pass upon an issue first.[19] In *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed.Cir. 1990), for example, the plaintiff had attempted to claim in court for the first time that, since selection of the best information otherwise available was at issue, the court could consider whether data underlying the ITA's selection should be updated to account for changes in interest and exchange rates for the French franc up to the review period. The court of appeals affirmed the Court of International Trade's dismissal of the attempt on the ground of failure to exhaust, noting that the plaintiff had not disputed the CIT's conclusion that the claim had not been presented for agency consideration "for tactical reasons". *Id.* at 1191. On the record here, it cannot be said that plaintiffs' challenge to the ITA's treatment is of the same ilk, but, on the merits, the agency's policy apparently is to treat general advertising as an indirect expense and product-specific advertising as direct. *E.g., Certain Internal–Combustion, Industrial Forklift Trucks From Japan*, 53 Fed.Reg. 12,552, 12,568 *Comment 38* (April 15, 1988); *Television Receiving Sets, Monochrome and Color, From Japan, supra. See N.A.R., S.p.A. v. United States*, 13 CIT ——, ——, 707 F.Supp. 553, 560 (1989).

The ITA found advertising in the record which references specific PETs. Its verification report for the 1985–86 period, for example, indicates an extensive examination of the expenses in question, finds numerous references therein to specific models, and concludes:

... We were not satisfied that the advertising costs incurred under the heading "Corporate" in BIC's Monthly Profit Center Report were advertisements simply marketing Brother as a company, consumer group or seller of typewriters.

ConfDoc 110, p. 18. Against this conclusion, and in light of the underlying facts on the record, substantial ground to order the claimed expenses treated as indirect upon remand is not evident. Ergo, only the agency's double deduction need be remedied.

### B

■■■■ The construction of values[20] for Brother L10+3, XL20+3 and XL80 PETs for the 1983–84 review period entailed no direct expenses and deduction of an incorrect amount for indirect expenses. The defendant consents to remand to consider plaintiffs' contention that it should have adjusted for certain direct expenses, as well as to correct the amount deemed indirect. The intervenor-defendant argues that remand is not warranted because (1) it is inappropriate to deduct direct and indirect expenses from values constructed for

---

(*see* Amended Index and Defendant's Exhibit 36); R.Doc 161, p. 12 (1985–86).

**19.** *See Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action"). *See also Hormel v. Helvering*, 312 U.S. 552, 556–57, 61 S.Ct. 719, 721–22, 85 L.Ed. 1037 (1941):

Ordinarily an appellate court does not give consideration to issues not raised below....

There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.

**20.** Constructed value includes the cost of materials and fabrication, general expenses and a reasonable profit, and the cost of containers and other expenses incidental to readying the merchandise for shipment to the United States. 19 U.S.C. § 1677b(e).

models sold in the United States based upon a home-market model and (2) the plaintiffs did not bear their burden on the issue during the administrative proceedings. However, the court agrees with the plaintiffs that these points are premature and simply notes for now that, when foreign-market value is constructed, the ITA may properly make adjustments for differences in circumstances of sale. *E.g., Timken Co. v. United States,* 11 CIT 786, 796–99, 673 F.Supp. 495, 506–09 (1987).

### C

■ It has been agreed that (1) packing expenses were added twice in the values constructed for models L10+3, XL20+3 and XL80 for the 1983–84 review period; (2) certain purchase-price sales were counted twice in the margin calculations; and (3) certain positive sales transactions were erroneously included in the ITA's home-market data base, as indicated in Attachment 11 to plaintiffs' memorandum. The intervenor-defendant opposes remand of these issues on the ground that the errors' effect upon the dumping margins was *de minimis.*

Again, however, where remand is otherwise necessary, it is appropriate to correct clerical errors even though the result thereof may be insignificant [21], for determination of margins as accurately as possible is a fundamental concern of this kind of case. Accordingly, the court agrees with the defendant that correction of the erroneous deductions should be made.

### D

■ All of the parties agree that a computer programming error caused an erroneous exporter-sales-price ("ESP") offset adjustment figure to be used in the dumping margins. The plaintiffs list "the known page and OBS numbers on the ITA's ESP printouts" where the erroneous adjustments appear and also request correction for any other OBS numbers where an incorrect ESP offset was used. Plaintiffs' Memorandum, pp. 75–79. The defendant and the intervenor-defendant desire to limit remand to correction of the observations as identified now by the memorandum.[22] The plaintiffs respond that they may not have identified all of the mistakes and consequently request that the remand direct that all transactions where an erroneous ESP offset was used be corrected, rather than limit remand solely to those in their memorandum.

The court, however, considers such an approach too broad at this time. It may well be that, if the computer programming error is rectified, all of the resultant errors to which plaintiffs allude will be corrected. When the programming is corrected, if ESP offset errors nevertheless remained [23], it would then be incumbent upon the plaintiffs to provide particulars so that the court could consider appropriate relief.

### E

■ The plaintiffs further allege, and the defendant agrees, that incorrect currency conversion rates and foreign-market values were used in the purchase-price margin calculations for all four review periods. The intervenor-defendant opposes remand on the ground that its examination of the record reveals that "Brother failed to overcome the presumption that the date of sale was the shipment date." Intervenor–Defendant's Memorandum, p. 53. The plaintiffs counter that this contention is "rebuffed by the Government's concession that a remand is appropriate to correct the

---

**21.** *See, e.g., Serampore Industries Pvt. Ltd. v. U.S. Dep't of Commerce,* 12 CIT 825, 834, 696 F.Supp. 665, 673 (1988).

**22.** The intervenor-defendant implies additionally that remand is not necessary since the plaintiffs have identified but a few, which, it claims, would only result in a *de minimis* adjustment to the margin. For the reasons already stated, however, it would be inappropriate not to make

ministerial corrections, even if *de minimis,* where remand is otherwise called for.

**23.** *Cf.* Plaintiffs' Response, p. 42 ("It is not clear why application of the 90–60 day rule or changing the comparative home market model caused the computer to not pick up the INDIRECT field. In some instances, the computer picked up the correct INDIRECT figure but then seemingly ignored it in determining the INDHM").

error, implying that Brother did 'establish to the ITA's satisfaction that the sales were fixed on the contract date as reported.'" Plaintiffs' Response, p. 44. This court concurs. The intervenor-defendant further argues that,

> even assuming Brother had established entitlement to the use of contract dates as the date of sale, it failed to call attention to the fact that the column headings contained in its sales listings were misnamed. At best, the use of "CONT DTE" to indicate the sales date, and "SALE DATE" to indicate the shipment date, was confusing.... In such circumstances, Brother has the burden of examining ITA's treatment of such sales for purposes of a preliminary determination and of calling attention to any error before the final determination is issued.[24]

In response, the plaintiffs assert that their questionnaire response instructions were clear. The issue is clouded somewhat by the defendant's concurrence that plaintiffs' selection of headings was not a model of clarity, but, having agreed on the point, the defendant still acquieces in remand of the issue, which is granted.

### F

The defendant and the intervenor-defendant agree that the ITA determination fails to deduct selling commissions from the foreign-market values for Brother Zorongo 11 and Electra 60 PETs for the 1982–83 period, and for the Wordshot for 1985–86. Nonetheless, the intervenor-defendant opposes remand on the ground the ITA was not required to make the requested deductions.

Here again, however, the court construes defendant's acquiescence as an indication that it has exercised its discretion in favor of making the requested adjustment.

### VI

In view of the foregoing, plaintiffs' motion for judgment on the agency record must be granted in part. On those issues on which remand to the ITA for further proceedings not inconsistent with this opinion is hereby granted, the agency may have 60 days from the date hereof to conduct them and to report the results thereof to the court, whereupon the plaintiffs may have 30 days thereafter in which to respond, and the defendant and the intervenor-defendant may have 15 days to reply thereto.

On all other issues, plaintiffs' motion must be, and it hereby is, denied.

So ordered.

---

**24.** Intervenor–Defendant's Memorandum, pp. 53–54, which proceeds to quote from *Asociacion Colombiana de Exportadores de Flores v. United States,* 901 F.2d 1089, 1093 (Fed.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990), as follows:

> That the Floramerica group can now show on appeal how a different ESP offset could have been calculated does not mean that the ITA's determination was not supported by substantial evidence when it was made. Under the regulations, the appellants had the burden of establishing their entitlement to the ESP offset. The ITA could take the appellants' February 5 submission for what it said and interpret it as setting forth the total ESP offset that Floramerica was claiming. The appellants should not be allowed to reconcile the ambiguities by rearguing their position when they had the opportunity to present their case unambiguously during the investigation. [emphasis deleted]